STATE, CHOSEN FREEHOLDERS OF UNION COUNTY, PROS-ECUTORS, v. CHOSEN FREEHOLDERS OF ESSEX COUNTY.

1. In reviewing the proceedings of commissioners appointed to ascertain the line between counties, (*Rev.*, *p.* 212, § 70,) this court has power, by virtue of the act passed in 1881, (ch. XXVII.,) to review the facts.
2. The legislature, by the act of 1857, creating Union county, intended to establish the line of Union township as designated in the act of 1808, as the division line between the counties of Union and Essex.
3. Until reliable marks can be found to indicate where the statutory line should be run, the safest guide will be the line as, hitherto practically adopted by the people in the locality.

On *certiorari* to review proceedings of commissioners to ascertain boundary line between the counties of Union and Essex.

Argued at February Term, 1881, before Justices VAN SYCKEL and MAGIE.

For the plaintiff, *Frank Bergen.*

The prosecutors of this writ seek to set aside the report of the commissioners, on the ground that the line surveyed and monumented by them is not the true division line between the counties of Union and Essex at the disputed locality. The whole controversy is a question of law depending on the construction of certain statutes. The commissioners were required to run the line in conformity with the act constituting the county. *Rev.*, *p.* 212, § 70.

The commissioners decided that the line mentioned in the

charter granted by Queen Anne to Newark in 1713, as surveyed by John Reid, is the correct line as matter of law.

The prosecutors insist that the Queen Anne line is illegal, for two reasons:

*First.* Because the Queen Anne charter was granted for the tract of land known as " Newark " prior to the date of the charter, and did not legally fix the boundaries of Newark, nor locate the line in question, except by reference to the land then " known by the name of Newark."

Hence we must look for the boundaries of Newark and the disputed line prior to the date of the charter, not in the charter itself. By the very words of the charter we are referred to earlier sources of information. That information may be found in "An act for dividing each county into townships," passed in 1693, twenty years prior to the date of Queen Anne's charter.

That statute was in force in 1713. The line is twice defined in it, and in both places it locates the easterly end at Bound Hill, which is no doubt Dividend Hill, and thence runs northwest. The line defined in the act of 1693 is the same that was agreed upon May 20th, 1668.

The words in the Queen Anne charter, " all that tract of land now known by the name of Newark," are a complete description of the territory, and clearly identify the tract of land for which the charter was granted. The words in the charter following those quoted, and which purport to give a particular description of the land, must be eliminated from the charter in construing it, as far as they tend to vary the general description, which is itself clear.

The law that applies to the construction of conveyances of land may be invoked to ascertain the meaning and scope of this charter—the point being to learn the intention of the grantor.

" Where a conveyance contains a general description of the property, which is definite and certain in itself, and is followed by a particular description, the latter will not limit the grant which is clear by the former." *Tyler on Bound.* 129,

200; *Jackson, ex dem., &c.,* v. *Moore,* 6 *Cow.* 707, 719; *Hodge's Lessee* v. *Lee,* 6 *Cranch* 237; *Bott* v. *Burnell,* 11 *Mass.* 163; *Mason* v. *White,* 11 *Barb.* 173; *Melvin* v. *Proprietors, &c.,* 5 *Metc.* 15, 28.

The line of the town of Dresden being described in the act of incorporation as running a northeast course, *including the whole of a certain farm,* when in truth that course would not include the whole farm, it was held that the lines of the farm should prevail, *as being the more certain monument,* and more evidently intended by the legislature. *Cate* v. *Thayer,* 3 *Greenl.* 71, cited and approved in 5 *Metc.* 28; *Keith* v. *Reynolds,* 3 *Greenl.* 393.

If there are two repugnant clauses in a deed, the first will be held to prevail. *Washb. on Real. Prop.* 405, 628, 629; *Tyler on Bound.* 123, 128, 129; *Cutler* v. *Trefts,* 3 *Pick.* 272; *Abbott* v. *Abbott,* 53 *Maine* 356; *Ela* v. *Card,* 2 *N. Hamp.* 175.

"When there are two contradictory descriptions of a thing, that description will be adopted which in its nature is least liable to be erroneous." *Tyler on Bound.* 130, 131; *Miller* v. *Chung,* 3 *Johns. Ch.* 24.

By the authority of the cases cited above, the "particular description" of the territory mentioned in the charter must be disregarded.

The *corpus* is fully and clearly defined by the general description.

It follows the general description, and is inconsistent with it.

A hundred and sixty-seven years passed from the date of the charter before it was claimed that the description recited in it fixed the boundary line.

*Contemporania expositio est optima et fortissima in lege.* *Hamilton* v. *McNeil,* 13 *Gratt.* 389.

The particular description is found in the charter only in the form of a *recital.*

It contains only the *claim* of a committee appointed for the purpose of settling a disputed matter.

The John Reid line has never been practically located or regarded as the true division line to this day.

The second word of the particular description is a conspicuous mistake : bounded " easterly" by a great creek, &c. A glance at the map will show that Bound creek never bounded Newark easterly.  In line 22, page 5, the description says that the line " extended " westerly.  It is true that the people of Newark claimed that the line had " extended " westerly from the head of the cove; but the claim had been relinquished by agreement and destroyed by legislation years before the charter was granted.

*Second.* If the John Reid line ever was legal, it has been changed by subsequent charters and legislation.  In 1739, twenty-six years after the Queen Anne charter, George II. granted a charter to Elizabeth.  The line is run from west to east.  From the foot of North Mountain the charter of George II. says : " Thence as that line runs to Dividend Hill."  This description is exactly copied in the act defining the boundaries of Elizabeth passed in 1789, which is the last statutory description of the line.

On the part of Union county, it is claimed that the true line is the one that runs to Dividend Hill.  Natural monuments control both course and distance. *Blackman* v. *Doughty,* 11 *Vroom* 319, 326, 327; *Jackson* v. *Perrine,* 6 *Vroom* 137, 144, 147; *Washb. on Real Prop., vol. III., p.* 405; *Tyler on Bound.* 29, 30, 119, 120, 184, 285, 286.

The John Reid line does not touch Dividend Hill.  See chancery map, and map of Essex county made in 1850.

It is true an attempt has been made to throw doubt on the location of Dividend Hill.  But the testimony in the form of opinions of witnesses who freely admit that they *do not know* anything about the location of the hill, certainly cannot throw doubt on a fact that is demonstrated by map and affidavits made more than a century ago, when there was no controversy about its location.

If my position is correct—to wit, that the commissioners were bound to follow a *statutory* line—they should have sur-

veyed and monumented the line in the act of 1693, which has never been changed by statute law. But it is said that the line would take a large part of Essex county. The commissioners had no equity powers. But if the *statutory* line must be abandoned to save the territory of Essex, why may not Union county use the same argument just as effectively against the long-forgotten charter of Queen Anne? The line adopted by the people, and marked on the map of Essex county in 1850, and on the map of Union county in 1862, may claim legality by many years of adoption and recognition by the people living in the neighborhood.

A political division line may be established by practical location, and after lapse of time it will not be disturbed, even if it differs considerably from the calls in the charter.

" Where a line between two towns was run out, located and established by the original proprietors of one of the towns, and that line was treated for more than fifty years as the correct one between the towns—*held*, that it must be regarded as the true jurisdictional line between the towns, notwithstanding it differed from the calls in the charter; and where it appeared that the line between the towns was also the line between the adjoining counties—*held*, that it was also the jurisdictional line between the counties." *Hanson* v. *Russell*, 28 *New Hamp.* 111. See also, to the same effect, the following cases: *Hamilton* v. *McNeil,* 13 *Gratt.* 389 ; *Kellogg* v. *Smith et al.,* 7 *Cush.* 375 ; *Kinney* v. *Farnsworth*, 17 *Conn* 355; *Leay* v. *Neville,* 25 *Cal.* 545 ; 1 *Texas App.* 41 ; 41 *Texas* 1.

In 1857, when the act creating Union county was passed, (see *Rev., p.* 209, § 54,) there was a well-defined and recognized line established between the townships of Union and Clinton. See map of Essex county, 1850, and map of Union county, 1862.

The line between those townships was itself a *monument* known to the public, and is the line referred to in the act forming Union county.

It was recognized by the statute of 1857 as the division

line, and ought not to be disturbed at this late day, for the purpose of making the line conform to the *preamble* of a charter one hundred and sixty-seven years old, especially when said line has never been practically located, or regarded as the true division line by the people living in the vicinity.

The consequences of disturbing the old line will be serious. Deeds and mortgages for the land lying between the John Reid line and the recognized line have been recorded in Union county for the last twenty-three years. Wills of people who lived between those lines have been proved in Union county. The people living there have paid taxes and voted in Union county since it was formed. Now the proposition is to disturb these vested rights established by long lapse of time, without notice to the people, for the purpose of locating a line discovered accidentally in an old charter a few months ago, which has never been considered legal, and had been forgotten for more than a century. If the line must be changed, it can only be done in conformity with statute law. All statute laws defining the line describe it as running from the mountain to *Dividend Hill.* There is no statute law in existence repealing or changing the act of 1693.

For the defendant, *J. W. Taylor.*

The opinion of the court was delivered by

VAN SYCKEL, J.    A dispute having arisen respecting the boundary line between the counties of Union and Essex, commissioners were appointed, under the act of March 5th, 1798, (*Rev., p.* 211,) to ascertain and mark the lines of partition. The report of these commissioners proved to be unsatisfactory to the chosen freeholders of Union county, who have caused it to be certified into this court for review.

These proceedings are a proper subject matter for review by *certiorari.    State* v. *Coleman,* 1 *Green* 98.

In the absence of special statutory power, errors of law only are reviewable.

The act of 1871 (*Pamph. L.* 1871, *p.* 124,) conferred the

power to determine disputed questions of fact.   *Craft* v. *Smith*, 6 *Vroom* 302.

In the Revision (p. 99, § 9,) this act was materially changed, and the power was limited to proceedings " touching any local or public improvement."

An amendment (passed in 1881, ch. XXVII.,) extends the power to review facts to cases where *certiorari* is prosecuted " to review the proceedings of special statutory tribunals."

These commissioners constituted a tribunal specially provided by statute for a particular purpose, and their proceedings are clearly within the operation of the supplement of 1881.

The duty of the commissioners, as prescribed by the statute, is " to cause the partition line between the two counties, so far as included in the order of appointment, to be run, surveyed, marked and ascertained in conformity, as nearly as may be, with the acts of the legislature constituting such counties and prescribing their boundaries." *Rev.*, *p.* 212, § 70.

Their appointment related to " so much of the line of partition between the counties as divides the township of Clinton, in Essex, from the township of Union, in Union."

The county of Union was created by act of March 19th, 1857, which defined the line in question thus : " Thence along the northerly and westerly line of division between the townships of Union and Clinton to the northerly division line of the township of Springfield."

Clinton and Union townships were previous subdivisions of Essex county, the former created out of the township of Newark, by act of February 19th, 1834, the latter created out of the borough of Elizabeth, by act of November 23d, 1808.

The borough of Elizabeth existed under a charter of George II., dated February 8th, 1739, and the act defining its boundaries in 1789.

The township of Newark received its charter from Queen Anne, April 27th, 1713, but had been previously established under the act dividing the counties of the colony into townships, passed in 1693.   *Leam. & Spicer* 328.

The commissioners have attempted to follow the line of the Reid survey of 1713, which purports to have been made under the Queen Anne charter.

Conceding that the Reid survey was an accurate location of the line, it is clear, from the history of this controversy, that as soon after that date as 1739 the line was in dispute. Whether the monuments by which Reid marked his line had disappeared, or whether the accuracy of his survey was then questioned, does not appear. It is beyond all doubt that there was then no recognized dividing line between Newark and Elizabeth.

At a town meeting held in Elizabeth June 18th, 1739, a committee was appointed to settle the division line.

Like action was taken by the people of Newark on the 24th of October, 1739, and again on the 12th of March, 1754. *Hatfield's Elizabeth* 319 ; *Col. N. J. Hist. Soc., vol. VI., pp.* 134, 140, 141.

The Elizabeth charter of 1739 calls for a division line running to Dividend Hill, and the act of November 28th, 1789, (*Paterson* 94,) defining the boundaries of Elizabeth, recognizes the same natural monument.

As early as 1668 there was a conference on Dividend Hill between commissioners from Elizabethtown and Newark, for the purpose of defining the disputed line, and in their certificate they say that it is agreed to begin the line " from the top of a little round hill named divident hill." *Col. N. J. Hist. Soc., vol. VI., p.* 10.

In the act of 1693, (*Leam. & Spicer* 328,) it is provided that " the township of Newark shall include all the land from the mouth of Bound creek, and from thence to Bound Hill."

The act of 1808 creating the township of Union describes the line of division as running to Dividend Hill, and the act of 1834 creating the township of Clinton, and bounding it by the township of Union, described in the prior act, is an avowal of a legislative purpose to limit the township of Clinton by the same landmark.

When, therefore, the act creating Union county, in 1857,

ran the county line between the townships of Union and Clinton, it is manifest that the legislature intended to establish the line as designated in the acts creating those townships, by running it to Dividend Hill, without any reference to the description in the Queen Anne charter of 1713.

If there is any diversity in those lines—which does not with any certainty appear—the later legislative declaration must prevail, it being competent for the legislature to alter the township line at any time.

The line as described in the Union township act of 1808 should have been reproduced, if possible.

The evidence shows that there is no existing monument which marks with any certainty the location of Dividend Hill, or the line as run by the Reid survey.

If no evidence is attainable by which the location of those monuments could be ascertained, what was the duty of the commissioners?

The practical location of a public boundary for a considerable time has been held to establish it, though not in accordance with that called for by the acts creating it. *Hanson* v. *Russell*, 8 *Foster* 111; *Hamilton* v. *McNeil*, 13 *Gratt.* 389; *Missouri* v. *Iowa*, 7 *How.* 660; *Kellogg* v. *Smith*, 7 *Cush.* 375.

*A fortiori*, where the line called for by the legislative acts cannot be traced, the line as practically located will be presumed to be the true one.

There is evidence to show that the inhabitants of the two townships and their officers have for fifty years or more recognized a boundary line considerably to the north of that found by the commissioners.

Township boundaries determine the place of voting of the inhabitants, the place where and the officers to whom their taxes are to be paid, and the officials on whom the duty of repairing roads rests. The action of public officers in respect to such matters, by being acquiesced in, gives recognition to the boundary line.

Winans' testimony shows that for fifty years he has paid taxes in Union township for land which the commissioners'

line places in Clinton; also, that other land-owners in the same locality have been' assessed and paid their taxes in Union, and that the roads have been worked as the roads of Union township.

Grumman, a witness who thinks the line fixed by the commissioners is the true one, admits that the line formerly regarded as the township boundary is three or four hundred yards further northward.

Shortly after Union county was set off, and prior to 1861, a stone monument was erected by committees of the freeholders of each county, marked " E. C." and " U. C.," to define the county line. This monument is claimed by the prosecutors to be in the true line; and since 1857, deeds and mortgages have been recorded in Union county as marked by this boundary.

If it be conceded that this line has not been so well defined and so fully recognized by the public authorities and by the people as to make it prevail over a line which could be clearly traced from the description in the legislative grants, yet, in the absence of reliable marks to indicate where such a line should be run, the safest guide will be the line practically adopted.

A departure from it will unsettle titles and lead to much confusion.

The line run by the commissioners is an arbitrary one, fixed without any recognized monuments to attest its accuracy.

I think their finding is erroneous, and should be set aside.