## PEMISCOT COUNTY, Appellant, v. WISCONSIN LUMBER COMPANY.

### Division One, February 29, 1912.

BOUNDARY LINE: "Middle" of Section. An act of the Legislature fixed the boundary line between Pemiscot and Dunklin counties to begin at a point to be reached by a line running due west from the junction of Portage Bay and Little River "to the middle of section 10," etc. Section 10 is 117 chains instead of the customary eighty chains, or one mile, in width. *Held*, that the boundary line between the counties lies one-half mile west from the east line of section 10.

Appeal from Butler Circuit Court.—*Hon. J. C. Sheppard,* Judge.

AFFIRMED.

*J. R. Brewer* for appellant.

(1) The word "middle" as used in the statute defining the boundary of Pemiscot, not being a technical word, should have its ordinary and usual meaning. "Words and phrases shall be taken in their plan or

ordinary and usual sense, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import." R. S. 1909, sec. 8057; State v. Jones, 102 Mo. 305; Warren v. Paving Co., 115 Mo. 572; State ex rel. v. Marion County, 128 Mo. 427; Henry v. Evans, 97 Mo. 47; State ex rel. v. Johnson, 132 Mo. 109; Manson v. Coleman, 86 Mo. App. 18; Grimes v. Reynolds, 94 Mo. App. 576. (2) We say that the "middle" of section ten, in township twenty, north of range ten east, is at a point equi-distant between the west boundary line of said section and the east boundary line of said section, that is, a point fifty-eight chains and ninety-five links due east of the east boundary line of said section ten. Definitions of "middle." Webster: "The point or part equally distant from the extremities or exterior limits." The Standard Dictionary: "Occupying a position equally distant from the extremes, as the middle point." The Century Dictionary: "The point or part equally distant from the two extremes." Worcester's Dictionary: "That part or place equally distant from the two extremes." What are the extremes or the exterior limits of section ten? The exterior lines of said section as a matter of course. But as the line drawn from the point where Portage Bay empties into Little River prolonged due west through said section ten would strike said section ten a quarter of a mile north of the "center" of said section ten, could not strike the "center" of section ten, the northwest corner of Pemiscot county could not be at the "center" of said section, that is, at the intersection of the quarter section lines of said section ten. The "middle" of said section ten is not at the point where the quarter section lines of said section intersect. In the Act of 1868 (Laws 1868, p. 16), the word "middle" is used thirty-five times, not counting the reference to section ten, and in each instance it means "equally distant between two extremes," as, "the

middle of the main channel of the river," the "middle of a township," the "middle of a range." Why, then, apply a different meaning when used in connection with section ten? It is true the witness, Randolph, testified that, starting at said junction-point and running due west to the middle of section ten, he would go to what is technically known as the center, but when cross-examined he further stated that the point to which he was to go, and not the direction, would control. He is confounding "middle" and "center." When called upon to state where he gets the idea that middle and center mean the same thing, he can give no authority except his own opinion, based upon the statute defining the boundary of Pemiscot county. The said Act of 1868 in defining the boundary of New Madrid county uses the word "center" four times, and each time it means the point where the quarter section lines intersect. The use of the two words "middle" and "center" in the same act shows that the Legislature had in mind the different meanings of these two words and rightly applied each. A section is a technical word and does not mean 640 acres of land laid off in one body, but is a survey of land and not necessarily 640 acres. Brown v. Hardin, 21 Ark. 324. (3) The county court is authorized by law to ascertain, and not to establish, a county boundary. This must be done by the Legislature. R. S. 1909, sec. 3625; Sturgeon v. Hampton, 88 Mo. 203; Johnson v. School District, 67 Mo. 319; Mauphin v. Franklin County, 67 Mo. 327; Bryson v. Johnson County, 100 Mo. 76; Phillips v. Butler County, 187 Mo. 714. (4) "The construction of a doubtful or ambiguous statute by the department charged with its execution, in order to be binding upon the court, must be long continued." A regulation of a department, however, cannot repeal a statute. Merritt v. Cameron, 137 U. S. 542. When there is no doubt this rule cannot be resorted to. United States v. Graham, 110 U. S. 219.

*Faris & Oliver* and *James M. Blazer* for respondent.

(1) The boundary line between Pemiscot and Dunklin counties was precisely as the lower court found. R. S. 1909, secs. 3572 and 3599; Harding v. Wright, 119 Mo. 1; Hamilton v. McNeil, 13 Gratt. (Va.) 394; Prentiss v. Brewer, 17 Wis. 635; 5 Cyc. 914; 1 Lester's Land Laws, p. 722; Turner v. Railroad, 112 Mo. 542; Edinger v. Woodke, 127 Mich. 41. It is a cardinal rule of construction, that the intention of the Legislature must prevail over the literal meaning of the words employed in a statute. State v. Tobacco Co., 177 Mo. 1; Felton v. United States, 96 U. S. 699; United States v. Babbit, 1 Black, 55; Trinity Church v. United States, 143 U. S. 457. And this rule applies with peculiar force to statutes regulating boundaries. Palms v. Shawano County, 61 Wis. 211; Perry County v. Jefferson County, 94 Ill. 214. (2) Appellant is estopped from asserting title to the lands in dispute. Simpson v. Stoddard County, 173 Mo. 465; Board v. Head, 33 Ky. 489; Union County v. Essex County, 43 N. J. L. 391; Hecker v. Sterling, 36 Pa. St. 423; Roane County v. Anderson County, 89 Tenn. 259; Briggs v. Jasper County, 49 Iowa 485.

BOND, C.—This action was brought on the 14th of June, 1907, in Pemiscot county, and by change of venue tried in Butler county. It was begun under what is now section 2535, Revised Statutes 1909, to ascertain and determine title to land.

Plaintiff claims title in fee to the lands described in its petition under an act of the Legislature of Missouri, passed March 27, 1868 (Laws 1868, p. 68), which donated to the respective counties in which they were situated, all the swamp lands granted to the State by act of Congress, approved September 28, 1850. It is further alleged that said lands were included in the

boundaries of the plaintiff county by the terms of the
act of the Legislature establishing them, passed in
1868; and which with reference to the boundaries of
Pemiscot and Dunklin counties, fixed the west bound-
ary of the former and the east boundary of the latter
to *begin* at a *point* to be reached by a line running
due west from the junction of Portage Bay and Little
River "to the middle of section 10, township 20, range
10 east." From this initial point, the line dividing
the two counties to run thence to the southern boun-
dary of the State of Missouri, where it touches the
northern boundary of the State of Arkansas. Plain-
tiff claims that the act of the Legislature intended this
beginning point to be located at half distance between
the east and west boundaries of section 10, township
20, range 10 east; and that if the line was so run it
included the land sued for.

Defendant, in addition to a general denial, pleaded
the existence of a dividing line between the two coun-
ties, which it averred was located in accordance with
the provisions and purposes of the legislative act, and
which began one-half mile west of the eastern bound-
ary of said section 10, and ran thence to the southern
boundary of the State; and that the lands sued for
were west of this line and were a part of Dunklin
county; that this line was established immediately
after the act of the Legislature was passed prescrib-
ing the boundaries of said counties, and that the State
of Missouri at once patented said lands to Dunklin
county, and that Dunklin county conveyed them to
defendant's grantors; that Dunklin county from that
time until the institution of this suit, a period of about
thirty-nine years, had treated said lands as a part of
its domain by levying and collecting taxes thereon
from the successive owners, and that defendant bought
them as a part of Dunklin county in reliance upon the
line of division so established and upon the acquies-
cence therein of the plaintiff; that in 1903 the two

counties appointed a joint commission to ascertain the boundary line between them, which reported the one which had been established and located as before stated, and that this report was confirmed by the county courts of each county and assented to by both counties; that plaintiff was precluded by estoppel and delay from any ground of relief in equity or in law. Issue was taken by reply.

On the trial the parties made the following stipulations: "1. That the lands, and all of them, in controversy in this suit are such lands as are known and designated as 'Swamp Lands.' 2. That the State of Missouri is the common source of title to and of the said lands in controversy, and all of them. 3. That the defendant is the legal and equitable owner and holder of all and whatever title the county of Dunklin, in the State of Missouri, has ever had in said lands, through mesne conveyances from the patentees and grantees of said Dunklin county."

The acts of the Legislature donating the lands and describing the boundaries of the counties were read in evidence. There was oral testimony tending to prove the matters pleaded in the answer, and also tending to prove that the existing line which had been recognized by the two counties for about thirty-nine years, was laid off in accordance with what expert surveyors would do in undertaking to follow the statutory calls. The evidence showed that section 10, within which the beginning point was fixed by the terms of the statute, though of the usual depth of eighty chains, was 117 chains in width. The trial judge made a finding of facts, which included the following: "The court finds that by said statute the northeast corner of Pemiscot county is located in the 'middle' of section 10, township 20 range 10 east, and that this point is at the point of intersection of the quarter-section lines of said section 10. That the dividing line between the two counties runs from this point south to the State

line between the States of Missouri and Arkansas, and that the lands involved in this suit all lie west of this line, and hence in Dunklin county, and belong to the defendant." And rendered judgment that said lands were well vested in defendant. Plaintiff duly perfected its appeal.

## OPINION.

I. The only error assigned is, that the court held the word "middle" as used in the statutory phrase, speaking of the northern point of the beginning of the south line to be run between Pemiscot county on the east and Dunklin county on the west, "to mean a point one-half mile from the east line to section 10, and not a point the exact half of the distance between the east and west lines of said section."

The section in question was unusual in size. It contained 943.20 acres instead of 640 acres. Its north and south lines are eighty chains apart. Its east and west lines are 117 chains distant, or nearly a mile and a half. If the recognized boundary now existing between the two counties is correct, then a larger part of said section lies in Dunklin county than is contained in Pemiscot county. If the boundary line were to be located and established as claimed by plaintiff, it would project about a furlong in width of said lands and twenty-seven miles in length into Pemiscot county. This narrow strip contains the land sued for.

The only point, therefore, arising under the error assigned, is whether the intent and language of the Legislature in establishing the boundaries as above expressed have been complied with in the existing division line. The intent of the Legislature is the key which unlocks the true meaning of the statute. This may be gathered by a construction of the terms used as affected by the view-point of the lawmakers and the objects had in mind and the environing circumstances. The boundary act (Laws 1868, p. 68) was

intended to describe lands by the use of just such words as would be put into a deed *inter partes*. In the matter in hand, the Legislature stood in the same position to the two counties as that of grantor to grantees. At the time of the passage of the act, the Legislature had no knowledge of the lands except that they had been sectionized by the government, which meant only that the section corners had been located and not that the lands had been surveyed. No lines showing the exact boundaries of the sections had been established. The ordinary and common size of a section is 640 acres, enclosed in one square mile. Abnormal sections are of infrequent occurrence. The surveyor's method of ascertaining the middle or center of a normal section of land is a matter of common knowledge. It may be done in many ways. The usual method is to ''project from the north quarter-section corner to the quarter-section corner on the south, and from the east to the west, and find the center of the section at the intersection of the two lines.'' It is always the meeting point of the four quarter-sections within a section. This custom of surveyors and the fact that the swamp lands in question were only surveyed to the extent of locating quarter section corners, and were otherwise unmeasured, and hence presumptively of regular dimensions, was fully within the knowledge of the Legislature when the boundary acts were passed which fixed the point from which the line must be run due south to separate Pemiscot and Dunklin counties. This rule has been applied between private owners. [Knight v. Elliott, 57 Mo. 317.]

Under these circumstances it is reasonable to presume, that the Legislature intended the middle of section 10 to be reached by the ordinary surveyor's method of finding the center of that section. This is what was actually done, and, according to the testimony of experts, is always done whether such point is referred to by the word center or middle, which are considered

by them to be interchangeable terms. The executive department of the State recognized the correctness of the boundary line established in this way by immediately patenting all the lands sued for to Dunklin county. The two counties were content with the division line thus created, and, as far as they could do through their county courts, ratified the action of the commission jointly appointed to ascertain the existence of the boundary line between them. At no time was this line transgressed by either county either for governmental or proprietary purposes. In fact it was shown on the trial that before the bringing of this suit the plaintiff county had sold all of its swamp lands, and in describing them in its contract with the purchaser has not included any description of or claim to those in suit.

We think there is no doubt that the State and the two counties have fixed the boundary line just as it was in fact located. We hold that the language of the Legislature under review intended, what the trial judge found, to establish and define the boundary line as it would have been marked out if section 10 had comprised the usual acreage and extent. This conclusion renders it unnecessary to consider the other grounds urged as a preclusion to this action. The judgment of the trial court was manifestly for the right party, and it is affirmed. *Brown, C.,* concurs.

PER CURIAM.—The foregoing opinion of BOND, C., is adopted as the opinion of the court. All concur.