## ALLUVIAL REALTY COMPANY, Appellant, v. HIM-MELBERGER-HARRISON LUMBER COMPANY.

### Division One, April 9, 1921.

1. **COUNTIES: Boundary Between New Madrid and Pemiscot: Government Survey.** When the Legislature in 1851 made the junction of Portage Bay with Little River one of the calls in describing the boundary line between Pemiscot and New Madrid counties, it did not have in mind some point fixed by a Government survey, but merely the physical object, the junction of the two streams.

2. ————: ————: **Junction of Streams.** As a physical object, constituting a natural monument, the junction of Portage Bay witn Little River, when the Legislature in 1851 fixed upon that junction as one of the calls in describing the boundaries between Pemiscot and New Madrid counties, was at the place where the waters of the bay, under normal conditions, flowed into those of the river and the bay lost its identity as a stream.

3. ————: ————: ————: **Center of Section Ten.** The Legislature, in 1868, in attempting to define the northern boundary of Pemiscot County fixed upon the "middle of Section Ten" as the western termination of the boundary, and by reversing the course and running due east from it, the location of another call, "the junction of Portage Bay with Little River," as it existed at the time of the passage of the act, is likewise fixed, and the boundary line is the east-and-west line through the middle of Sections Nine and Ten.

4. ————: ————: **Evidence: Practical Interpretation of Statute.** The "Government Tract Book of New Madrid County," the "New Madrid County Plat Book" certified by the Register of Lands, and testimony relative to the assessments by New Madrid County of the lands in the disputed territory, were all competent evidence upon the issue whether the lands are situate in Pemiscot or New Madrid County. Collectively they tended to show the interpretation put upon the Boundary Act of 1868, defining the boundary between the two counties, by the United States Land Office and by the executive department of the State, and to show that there was a practical location of the boundary, conforming to such interpretation, acquiesced in and treated as correct by the public authorities and the counties themselves for many years.

5. ———: ———: **Quieting Title: Jurisdiction.** The Circuit Court of Pemiscot County, in a suit to ascertain and determine title, having determined that the lands were in New Madrid County, had no jurisdiction to adjudge "that the plaintiff has no right, title, claim or interest in and to said lands."

Appeal from Pemiscot Circuit Court.—*Hon. Sterling H. McCarty,* Judge.

AFFIRMED (*in part*); REVERSED (*in part*).

*John A. Hope* and *Ward & Reeves* for appellant.

(1) The court erred in dismissing plaintiff's petition and adjudging the land in question to be in New Madrid County. (a) This being swamp and overflow land, it passed to the State from the United States Government by Act of Congress, September 28, 1850, and by subsequent act of the Legislature said lands were donated to the counties in which they lie. 9 U. S. Stat. at Large, p. 519; Laws 1852-3, p. 108; Laws 1857, p. 32; Laws 1868, p. 69; Sec. 7995, R. S. 1909; Russ v. Sims, 261 Mo. 46; Mosher v. Bacon, 229 Mo. 338. (2) The first grant of this land by the State to the county was February 23, 1853 (Laws 1852-3, p. 108), which was subsequent to the establishment and fixing of the boundary of Pemiscot County on February 9, 1851. So the title to to this land was never in New Madrid County. Neither State nor county can sell by patent or otherwise any land after having first granted same to another. Laws 1851, p. 190; Mosher v. Bacon, 229 Mo. 338; Keaton v. Hamilton, 264 Mo. 564. The right to a patent once vested as respects the Government is equivalent to a patent. Johnson v. Fluetsh, 176 Mo. 470; Mosher v. Bacon, 229 Mo. 350. (3) The statute fixing the boundary line of Pemiscot County begins at a northeast corner of the county in the middle of the Mississippi River and goes in a direction west to the point in controversy, and it uses this language: " Thence along the middle of said Collins Lake or Portage Bay, to its junction with Little River; thence due west

to the middle of Section Ten, in Township Twenty, North of Range Ten, east; thence due south to the southern boundary of the State, etc." Sec. 3599, R. S. 1909. (4) The Legislature, in using the word middle (of Section 10) did not use it with the same meaning as the word center. (5) The court will take judicial notice that the land is in Pemiscot County. Keaton v. Hamilton, 264 Mo. 564; Woods ex rel. v. Henry, 55 Mo. 563; Parker v. Burston, 172 Mo. 87; 17 Am. & Eng. Ency. Law (2 Ed.), pp. 9, 12, 13; 1 Greenleaf on Evidence (6 Ed.), p. 10. And when the county boundary is in question it is the duty of the court to construe the language of the statute fixing the boundary line. Sec. 8057, R. S. 1909; State ex rel. v. Railway, 105 Mo. App. 207; Keeney v. McVoy, 206 Mo. 65. (5) It is a well-settled rule of construction that natural and permanent monuments control artificial marks, courses and distances; and that natural monuments, artificial marks, and distances or area are usually controlled in the above named order. The general rule is that calls for natural or permanent objects in an entry, survey or conveyance will control other conflicting calls. This rule has been applied with respect to such objects as streams or rivers or a shore of a lake, etc. However, an unmarked line is not a natural monument within the rule. The principle on which calls for natural monuments are ordinarily given preference over other calls is that there is less likelihood of mistake in calls of this character. Whitewell v. Spiker, 238 Mo. 637; Whitehead v. Regan, 106 Mo. 235. Natural monuments and objects called for in deeds will control though they conflict with courses and distances; and where a deed calls for a river as a boundary this call will prevail over artificial monuments, courses and distances. Campbell v. Clark, 8 Mo. 553; Myers v. City, 82 Mo. 367; Burnham v. Hitt, 143 Mo. 414; Peterson v. Beha, 161 Mo. 513; Jacob v. Mosely, 91 Mo. 457. "Natural monuments" are such natural or permanent objects as streams, rivers, ponds, shores, beaches and the like. 5 Cyc. 869; 9 C. J. 161; 3 Washburn, Real Property (6 Ed.), sec. 2332; Tiedeman on Real Property (2 Ed.), sec.

831; Goodson v. Fitzgerald, 40 Tex. C. App. 619. "Artificial monuments" are landmarks and signs erected by the hand of man. 5 Cyc. 87; 9 C. J. 162. "A monument" is some tangible landmark established to indicate a boundary and is a fixed visible object. 9 C. J. 160; Bouvier's Law Dictionary; Koch v. Gordon, 231 Mo. 652. A subdivision line between two tracts of land which was the center of a certain section (as middle of Section 10), which is invisible and ascertainable only by measurement, and which is liable to differ in location according to the result of surveys, is not a monument. Guitar v. St. Clair, 238 Mo. 627; Koch v. Gordon, 231 Mo. 645; Dolphin v. Klann, 246 Mo. 487. The general rule is that the beginning point, when established, is determined to be of controlling authority; and if the starting point is fixed, certain and notorious, and there is a conflict between it and other calls the latter must give way to the former. But when succeeding calls are as readily ascertained and are as little liable to mistake, they are of equal dignity with the first, and when they all conflict with the first and agree with each other, their united testimony must control. Hubbard v. Whitehead, 221 Mo. 683; Walsh v. Hill, 38 Cal. 431; 9 C. J. 164. (6) Original corners as established by the Government surveyors are conclusive on all persons. 9 C. J. 164; 5 Cyc. 950; Woods v. Johnson, 264 Mo. 295; Climer v. Wallace, 28 Mo. 559; The Mayor v. Burns, 114 Mo. 430; Grandley v. Davis, 156 Mo. 429. It is well settled in this State that the field notes of the United States surveys of public lands made prior to their conveyance to the State, or to private persons, will control in ascertaining locations of corners, lines and locations. Lbr. Co. v. Ripley County, 270 Mo. 135; Bradshaw v. Edlan, 194 Mo. 640; Carter v. Hornback, 139 Mo. 243; Shelton v. Maupin, 16 Mo. 124.

*Oliver & Oliver* for respondents.

(1) This is an action at law under the statute to determine title, and was tried before the court without

the intervention of a jury.  No instructions were asked
and none were given.  The finding of the trial court takes
the place of a verdict by jury and as such is not subject
to review on appeal.  Woods v. Johnson, 264 Mo. 293;
Smith v. Royse, 165 Mo. 657; Hatton v. St. Louis, 264
Mo. 646; Chilton v. Nickey, 261 Mo. 242; Zimmerman
v. Ry. Co., 156 Mo. 565; Sutter v. Raeder, 149 Mo. 307.
(2)  Under the issues, it was essential that appellant
prove the title to the lands in dispute, having failed
to do so it has no standing in this court.  The appellant
having averred it was the "absolute owner" must sup-
port that averment or it fails.  Wheeler v. Land Co.,
193 Mo. 283; Stewart v. Land Co., 200 Mo. 288.  (3)  No
conveyance of the lands in suit was made by the State
prior to the act of the General Assembly of 1868; and
that act did not have the effect of passing title to Pem-
iscot County.  Simpson v. Stoddard County, 173 Mo.
449; Carmen v. Johnson, 20 Mo. 108; Sturgeon v. Hamp-
ton, 88 Mo. 203. (4) Nor did the act of the General Assem-
bly of 1869, in itself, vest the title of swamp lands in the
counties in which said lands were situated. It required
the issuance of a patent before title vested.  Laws 1869;
Hamilton v. C. B. & Q. Railroad, 124 Ill. 243.  (5)  The
court did not commit reversible error in permitting the
respondent to show: (a) That the lands in suit had been
accepted by New Madrid County and had been assessed
by the county officials of that county.  The fact that these
lands had been claimed by New Madrid County since
1875, when the patent was made to it by the Governor, was
a fact the court might properly consider, in determining
the conduct and action of the two counties with reference
to the acceptance and location of the lands in suit. What
weight the court attached to such testimony is another
question. What weight the court actually gave to this evi-
dence, if any, is not shown by the record, therefore no prej-
udice can be attributed to its admission.  (b)  Nor did
the court commit reversible error in permitting the re-
spondent to offer the "Plat Book" of New Madrid Coun-
ty.  This book is a record which the law requires counties

in this State to procure from the register of the United States land office. Sec. 11363, R. S. 1909. The statute makes the entries appearing on this "Plat Book" competent evidence. Secs. 6290 and 6289, R. S. 1909. (c) Nor did the court commit reversible error in permitting respondent to offer the "Swamp Land Abstract" book of New Madrid County. This book seems to have been made for the convenience of the county court of New Madrid County in disposing of its swamp lands and was an ancient record in the office of that county. (d) Nor did the court permit any error in permitting the respondent to introduce the "Tract Book" of New Madrid County which shows the lands in suit are located in New Madrid County and shows that the line dividing New Madrid from Pemiscot County runs from the center of Section Ten, Township Twenty, Range Ten, through a tier of sections until it intersects the waters of Little River in Section Nine, Township Twenty, Range Twelve. Secs. 1 and 9, Laws 1868, pp. 68-9-70; Secs. 7995 and 8000, R. S. 1909. (e) Nor did the court commit reversible error in permitting the respondent to show where the (middle of this) channel or thread of Portage Bay water intersects, joins or flows into and with the water of Little River. This was competent as shown by the testimony of W. B. Rossiter. The intersection of the banks of Portage Bay with the east bank of Little River was not the same place where the waters of the two streams came together. The statute refers to a "junction" of waters; not land. Hubbard v. Whitehead, 221 Mo. 682. f) Nor did the trial court commit reversible error in permitting the surveyors, N. C. Frissell and F. M. Robbins to explain in detail how and what a surveyor would have to do in establishing, ascertaining and running the line that separates the two counties. Hubbard v. Whitehead, 221 Mo. 682. (6) The General Assembly in passing the Statute of 1868 fixing the boundary line, clearly intended that the line should be a straight one without fractionalizing any legal subdivision of any government survey. This intention of the lawmakers should prevail; and the court in ascertain-

ing that intention will take into consideration the facts and circumstances existing and known to the lawmakers at that time. Laws 1868, p. 19; Sec. 3599, R. S. 1909; Hubbard v Whitehead, 221 Mo. 682; Cooley v. Warren, 53 Mo. 168. (7) This court had conclusively and definitely settled the location of the northwest corner of Pemiscot County to be the center (middle) of Section Ten, Township Twenty, Range Ten. You have declared this a fix monument. It was the precise point or definite monument that the Legislature intended for the corner between the counties of Pemiscot and Dunklin and to be the controlling monument in fixing the north boundary of Pemiscot County, or the south boundary of New Madrid County. That question is, therefore, a closed one. Pemiscot County v. Wisconsin Lumber Co., 240 Mo. 377.

RAGLAND, C.—Statutory action to determine title to real estate instituted in the Circuit Court of Pemiscot County, October 19, 1917. The petition alleges in substance that the plaintiff is the owner in fee simple of the south half of the north half of Section Eight, containing one hundred and sixty acres, and the south half of the north half of Section Nine, containing one hundred, fifty-five and 28/100 acres, all ·in Township Twenty, north, of Range Eleven, east, in Pemiscot County, Missouri; and that the defendant claims some title, interest, or estate therein, adverse to plaintiff. The prayer is conventional.

The answer consists of a plea in abatement and one in bar. In the first it is averred that the lands in question are not in Pemiscot County, but that they are situated in New Madrid County, and on that ground it challenges the jurisdiction of the Circuit Court of Pemiscot County to determine any question affecting their title. In the second, after a denial of the allegations of the petition as to the location of the lands and plaintiff's title thereto, it is averred that the lands in controversy are situated in New Madrid County and that the defendant is the sole and absolute owner of them.

287 Mo.—20

It was admitted that the title to the lands in controversy passed from the United States to the State of Missouri under the Act of Congress of September 28, 1850, commonly known as the Swamp Land Grant. The acts of the Legislature donating the lands and prescribing the boundaries of Pemiscot and other counties were read in evidence. Documentary evidence was introduced showing that on November 2, 1891, Pemiscot County issued to Louis Houck a patent to the lands in controversy; that on May 25, 1899, New Madrid County issued a like patent to John H. Himmelberger; and that severally through mesne conveyances the plaintiff acquired whatever title passed under the Pemiscot County patent, and the defendant whatever passed under that of New Madrid County.

Over the objections of plaintiff, defendant put in evidence what was designated as the "Government Tract Book of New Madrid County" and the New Madrid County Plat Book. The "Tract Book" purported to contain a list of all lands granted to the State of Missouri by the United States that were situated in New Madrid County and was duly certified August 24, 1869, by the Register of the United States Land Office at Ironton, Missouri. The Plat Book was certified May 19, 1875, by the Register of Lands for the State of Missouri. Both included the lands in controversy as being located in New Madrid County. The Plat Book portrayed the boundary line between New Madrid County and Pemiscot as following Portage Bay into Little River, running thence with the course of the stream southwest to the quarter section line between the north and south halves of Section Nine, Township Twenty, north, Range Twelve, east, and thence due west with the quarter section lines of the intervening sections to the center of Section Ten, Township Twenty, north, Range Ten, east. Defendant also read in evidence a patent from the State of Missouri to New Madrid County, purporting to convey to that county, among others, the lands in question.

The act organizing Pemiscot County and pre-scribing its boundaries was passed February 9, 1851. [Laws 1851, p. 190.] The territory of the new county was therein described as follows: "All that portion of New Madrid County lying south of line beginning in the middle of the main channel of the Mississippi River, immediately opposite Major's mill race, and running thence along said mill race to the Cushion Lake byou; and thence along said Cushion Lake byou, to the Cush-ion Lake; thence along the middle of said Cushion Lake to a point opposite to the head of Collins Lake, or Port-age Bay; thence along the middle of Collins Lake or Portage Bay to its junction with Little River; *thence due west to the eastern boundary of Dunklin County.*" In 1868 an act, amendatory of the general statutes then in force defining county boundaries, was passed. This act redefined and fixed the boundaries of twenty odd counties—Dunklin, Pemiscot and New Madrid, among others. It describes the line between New Madrid and Pemiscot in the same language as the Act of 1851, ex-cept as to the last call, which was made to read: "*thence due west to the middle of Section Ten* (10), *in Township Twenty* (20), *north, of Range Ten* (10), *east.*" [Laws 1868, pp. 20 and 21.] The only boundary of Pemiscot County affected by the amendment was that between it and Dunklin County on the west. Theretofore its west boundary (the east boundary of Dunklin County) had been a line extending due south from the intersection of the west edge of the Little River Swamp with parallel of latitude 36 degrees and 30 minutes north; it now be-came a line beginning at the middle of Section Ten, Township Twenty, north, of Range Ten, east, and run-ning thence due south to the southern boundary of the State.

The boundaries of Pemiscot County as defined by the Act of 1868 have never been changed. [Sec. 9382, R. S. 1919.] The line in dispute begins at the junction of Portage Bay with Little River and runs "thence due west to the middle of Section Ten," etc. The two

streams unite in Section Nine in Township Twenty, north, of Range Twelve, east. A certified copy of the plat of said Township Twenty, made June 1, 1852, under the direction of the Surveyor General of the United States from the field notes of the survey thereof, was offered in evidence by the plaintiff. The Surveyor General's certificate recites that the west boundary and the north boundary east of Little River and part of the subdivision lines were surveyed in 1848, and that the survey of the township was completed in January and February, 1851. The following is a reproduction of so much of the plat as shows the boundaries of Section Nine, the meanders of Little River and Portage Bay therein and the subdivision lines of the section:

Scale 10 chains to the inch.

From certified copies of plats obtained from the General Land Office, introduced in evidence by the plaintiff, it appears that the surveys of Township Twenty, north, of Range Eleven, east, and Township Twenty, north, of Range Ten, east, were completed in 1858 and in 1860, repectively; that is, the boundaries had been run and the townships sectionized.

The plat of Section Nine, Township Twenty, Range Twelve, east, herein before reproduced, discloses that the subdivision line between the north and south halves of the north half of the section passes between the points of intersection respectively of the north and south meander lines of Portage Bay with the east meander line of Little River. It further shows that the subdivision line just mentioned is a short distance south of the intersection of the middle line of Portage Bay with the east meander line of Little River.

The meander lines indicate that Little River at the place where Portage Bay flows into it is three-eighths of a mile wide. According to the oral testimony they correctly represent the river in that respect as it was at the time of the survey and as it continued to be unt' as late as 1898—before the work of reclamation was actually begun in that territory. The west side of the river at that point, however, was nothing more than a brush covered swamp; the open water and current at normal stages were, generally speaking, on the east side. There was a high, well-defined bank along the lowland on the east side, and through an opening in this bank Portage Bay flowed in its course to join the river. The point where the waters of the two streams actually came together is left uncertain. Otto Kochtitzky, a surveyor of many years experience and a witness for plaintiff, testified that he last saw Little River where Portage Bay empties into it in 1898, and that at that time the river opposite the opening in the high bank just referred to was about 400 feet wide; he did not say, however, how near its waters approached the high bank at that point. Being asked where the thread of the stream was along there, he said: "As I remember it, the deeper

part of the channel of Little River follows the east side down to pretty near the mouth of the bay, maybe three or four hundred feet north, then sweeps across to the open water on the west side for a distance. That is not a continuous and well defined channel; the deep places show themselves occasionally along the general channel of the river, and at very low water the deep places will almost show to be perfectly flat, almost no channel at all." He also testified that the course of Portage Bay where it discharged its waters into Little River was northwest; that it formed almost a perfect right angle with the river. In explanation of that statement he said that he did not regard the place where the waters of the two streams came together as their junction, but the place where the outer or high water banks joined. Plaintiff called as witnesses two other surveyors who had had occasion some eighteen or twenty years before to inspect Little River where it was joined by Portage Bay. They testified merely that the junction of the two streams was correctly defined by the Government meander lines. W. B. Rossiter, County Surveyor of New Madrid County, a witness for defendant, made an examination of the channels of the river and the bay in the vicinity of their junction a few months before the trial. at that time the river had been drained—all the water withdrawn, and the bay was very low—just a few little puddles. He testified that the bay in its approach to the river comes upon in a northwest course and just before it gets to the river turns to the southwest; that by projecting a line equally distant between the meanders of the bay it would intersect a median line of the river at the quarter section line (east and west) of Section Nine.

Defendant introduced in evidence over the objections of the plaintiff: (1) A book that had been kept for many years in the office of the County Clerk of New Madrid County, designated as the "Swamp Land Abstract for New Madrid County, Missouri;" it was not identified by any official certification, nor was it shown by whom or under what authority it was made; it contained a list of the lands in controversy. (2) An

order of the County Court of Pemiscot County, made May 25, 1903, reciting that the county lines between Pemiscot, New Madrid and Dunklin Counties were indefinite and had not been permanently located, and directing the county surveyor to proceed with the surveyors of the other counties named to establish the line. And (3) testimony tending to show that the lands within the disputed territory had for many years been assessed for taxes by New Madrid County.

The cause was tried to the court. No declarations of law were asked or given. The court found the issues for the defendant, and rendered a judgment wherein it was adjudged that the lands in controversy are situated in New Madrid County, and that plaintiff's petition be dismissed. It was further adjudged that the plaintiff had no right, title or interest in and to said lands.

From the judgment so rendered, plaintiff in due course perfected its appeal to this court.

Appellant's contentions may be epitomized to this effect: Plaintiff, by documentary evidence and by oral testimony that was uncontradicted by any substantial competent evidence, made a case establishing its title; this court should, therefore, reverse the judgment *nisi* with directions to the court below to enter judgment for plaintiff.

As already indicated by the statement of facts, the disposition of this controversy, both as to the merits and with respect to the jurisdiction of the Circuit Court of Pemiscot County to hear and determine it, depends solely upon a determination of the location of the boundary line between Pemiscot and New Madrid Counties. That is the sole question at issue. If the land is in Pemiscot, it belongs to the appellant; if in New Madrid, to the respondent.

I. According to appellant a line drawn from the junction of Portage Bay with Little River (Section Nine, Township Twenty, north, Range Twelve, east) would lie just a quarter of a mile south of the northern boundary

Junction
of Streams.

of the tier of sections between the termini; that is, it would be along the subdivision lines bisecting the north halves of those sections. According to respondent such line would be a quarter of a mile still further south coincident with the quarter section lines extending east and west through the centers of the sections. It is apparent, therefore, that the locations of both termini are in question.

Appellant takes the position that the location of the junction of Portage Bay with Little River is fixed and determined by the United States Survey. This, because the monuments or corners as established by the Government are, as a matter of law, conclusive; and because the Legislature is presumed to have defined the boundary with this survey in mind. Based on the premise that the begining point is definitely located by the Government survey, appellant states, or rather assumes, that the boundary line runs thence west on the quarter section lines bisecting the north halves of the sections. But if this premise were sound, still the boundary would not be coincident with the subdivision lines just referred to. If the point of beginning is to be determined from the plat, it would be where the middle line of Portage Bay intersects the east meander line of Little River and, as already indicated, that point is some distance *north* of the quarter quarter section line. If, therefore, appellant's hypothesis be correct, the Legislature intended to so run the boundary as to put indefinite fractional parts of the *north* halves of the north halves of the sections through which it runs into each county.

Recurring to the propositions advanced by appellant as grounds for its contention that the junction of Portage Bay with Little River is fixed by the Government survey, it is sufficient to say, as to the first, that even if the rule of law that monuments and corners established by the United States are conclusively deemed to be correct were applicable, still it would avail appellant nothing in this case. The Government surveyor did not attempt to locate or mark the junction of the two streams, he merely surveyed the meanders of their outer or high-water banks.

As to the second, it affirmatively appears that the meanders of these streams were surveyed in January and February, 1851. It is extremely improbable that the Legislature had any knowledge of the survey, even if completed, when it passed the first act defining the boundary between Pemiscot and New Madrid Counties on February 9, 1851. Besides, there is no reference to a survey, either directly or impliedly, anywhere in the act. It describes the boundary line as beginning in the middle of the channel of the Mississippi River, extending thence westwardly along certain water courses to the junction of Portage Bay with Little River, and thence due west to the eastern boundary of Dunklin County. It is apparent, therefore, that the Legislature, when it made the junction of Portage Bay with Little River one of the calls in describing the boundary lines, did not have in mind some point fixed by a Government survey, but merely the physical object, the junction of the two streams.

As a physical object, constituting a natural monument, the junction of Portage Bay with Little River was at the place where the waters of the bay, under normal conditions, flowed into those of the river and the bay lost its identity as a distinct stream. [Rowe v. Lumber Company, 133 N. C. 433, 440.] If the plat had been the only evidence offered relating to the place of the junction, it would, perhaps, have necessitated a finding that it was at the east meander line of Little River between the meander lines of Portage Bay. But there was other evidence and it tends to show the contrary. Plaintiff's witness, Kochtitzky, testified that in 1875 and 1898 Little River at the place in question had no continuous well defined channel, that the deeper part of it followed the east side down to pretty near the mouth of the bay—three or four hundred feet north—then swept "across to the open water on the west side." It is true that he said that the junction of the streams was at the opening in the high bank on the east side of the river but it is plain that he was giving his opinion as an expert and not testifying to the physical conditions as they

existed.   When defendant's witness, Rossiter, made an examination a few months before the trial, the waters of the two streams had practically disappeared.   Little River had been drained and Portage Bay had dried up. The high banks of both and the channel of the bay apparently were unchanged.   He testified that the bay just before reaching the river turned southwest; and that if the thread of its channel were projected in the direction of its southwest course, it would intersect the median line of Little River, as fixed by the survey of its meander lines, on the quarter section line (east and west) of Section Nine.

II.   Owing to the transformations and partial obliterations of the water courses in that territory, effected by works of reclamation, it would no doubt be difficult, if not impossible, to determine, independently of the subsequent calls in the statutory description of the boundary line, the precise point where the waters of Portage Bay joined those of Little River in 1851 or in 1868.   The next call is "the middle of Section Ten, in Township Twenty, north, of Range Ten, east," and the point called for is described as "due west of the junction of Portage Bay with Little River."   Appellant insists that this call should be construed as though it read: "the middle *line* of Section Ten."   This, on its theory that the junction of Portage Bay is at a point between the northern boundary and the center of Section Nine from which a line could not be projected due west to the center of Section Ten, but from which it could be so projected to some point on the middle line (north and south) of that section.   But appellant having failed to establish its theory as to the place of the junction of the two streams, the reason, or necessity, for a construction that would add the word "line" after the word "middle" fails with it.   There does not seem to be room for serious controversy as to what the Legislature meant by the words, "middle of Section Ten."   In Pemiscot County v. Lumber Co, 240 Mo. 377, involving an interpretation of the same language, but as descriptive of the boundary between Pemiscot

*Quarter-Section Line.*

and Dunklin Counties, we held that "middle," as used in the Boundary Act with reference to Section Ten, was synonymous with "center." In connection with what was said in that case, we might add that the Legislature in all boundary acts, including that of 1868, in establishing county boundaries, almost invariably followed the plan of making such boundaries conform to the lines of natural barriers, or the lines or regular subdivision lines of Government surveys. When the Act of 1851 was passed cutting Pemiscot off of New Madrid County, the surveys of the boundaries of the townships through which the division line between the two counties passed was just being completed. The townships were not then sectionized. But when the Act of 1868 was passed the section and quarter section corners had been established, and we find the Legislature redefining the part of the boundary extended due west from the junction of Portage Bay with Little River by making it terminate at the middle of Section Ten instead of at the eastern boundary of Dunklin County, which prior to the passage of the act was a line extending south from the west edge of Little River swamp. And our holding in Pemiscot County v. Lumber Co., supra, was, in substance, that the legislative intent, as expressed by the act, was that the western boundary of Pemiscot County should be on the quarter section lines (north and south) of Section Ten rather than on a line equidistant between the east and west boundaries of that section. So with reference to the northern boundary, we think it more reasonable to suppose that the Legislature, in splitting a row of sections eleven miles long with a county boundary, intended that such boundary should be coincident with the quarter section lines rather than with one that would, for no apparent reason, put indefinite fractional parts of the subdivisions through which it passed into each county.

III. If the center of Section Ten is the termination of the disputed boundary, and we so hold, then by reversing the course and running due east from it, the location

Middle of Section 10. of the junction of Portage Bay with Little River, as it existed at the time of the passage of the boundary acts, can be ascertained and all difficulty with respect to the boundary thereby obviated. [Ayers v. Watson, 137 U. S. 584, 604.]

IV. "The Tract Book," the Plat Book, the patent from the State to New Madrid County, the "Swamp Land Abstract for New Madrid County" and the testimony relative to the assessments by New Madrid County of the lands in the disputed territory, were all properly received in evidence. They were competent because collectively they tend to show the interpretation put on the Boundary Act of 1868 by the United States Land Office and by the executive departments of the State. And further, that there was a practical location of the boundary, conforming to such interpretation, which had been acquiesced in and treated as correct by the public authorities and the counties themselves for many years. Such practical location of a public boundary should not be disturbed unless it be clearly and unmistakably shown to be erroneous. On that ground alone the trial court's finding, on the facts in proof, would be justified. [Union County v. Essex County, 43 N. J. L:. 391; Hecker v. Sterling, 36 Pa. St. 423.]

V. The finding, however, that the lands in controversy are situated in New Madrid County disclosed the narrow limits of the court's further jurisdiction. The judgment is reversed in so far as it attempts to adjudge "that the plaintiff has no right, title, claim or interest in and to said lands;" in all other respects it is affirmed. *Brown* and *Small, CC.,* concur.

PER CURIAM:—The foregoing opinion of RAGLAND, C., is adopted as the opinion of the court. All of the judges concur, except *Elder, J.,* not sitting.