G. M. HANSEN ET AL., Appellants, v. W. F. DUVALL ET AL.—62 S. W. (2d) 732.

Division One, June 24, 1933.

*McVey, Freet & Randolph, Hallett & Hallett* and *Roy W. Rucker* for appellants.

*J. A. Silvers* and *D. C. Chastain* for respondents.

FRANK, P. J.—Appellants, plaintiffs below, were the owners of eight hundred acres of land in Miami County, Kansas. In July, 1926, they executed an oil lease on said land to one A. W. Christy, by the terms of which plaintiffs were to receive a royalty equal to one-eighth of all oil produced and saved from the leased premises. Later plaintiffs by deed conveyed to defendant, W. F. Duvall, one-fourth of their one-eighth royalty interest. By this suit plaintiffs

ask that said royalty deed and other written instruments executed by them in connection with the transfer of said royalty interest be canceled and that defendants be required to account for all funds received by them under said deed and written instruments, or in lieu of such cancellation, defendants be required to convey such royalty interest to plaintiffs. The theory of plaintiff's petition is that the deed and other written instruments by which such royalty interest was transferred to defendants were void on account of usury in that defendants exacted and received the transfer of such royalty in addition to the legal rate of interest for the use of money.

The suit was instituted in the Circuit Court of Bates County, and went on change of venue to the Circuit Court of Vernon County where the cause was sent to a referee, who after hearing the evidence, found there was no usury in the transactions, and that plaintiffs were not entitled to any relief, and so reported to the court. Plaintiffs filed numerous exceptions to the referee's report. Such exceptions were overruled, the report of the referee was approved and judgment rendered accordingly. Plaintiffs appealed.

Defendants contend that we have no jurisdiction of the subject matter of this suit for the reason that a Missouri court is powerless to render a decree directly affecting the title to lands situate in the State of Kansas. State ex rel. v. Grimm, 243 Mo. 667, 148 S. W. 868, is cited in support of this contention. In the Grimm case, this court en banc construed the petition in that case as stating a case for the cancellation of a deed to lands located in the State of Virginia, and prohibited the Circuit Court of the City of St. Louis from further proceeding with the case because of lack of jurisdiction. In so holding, we said:

"The cancellation of a recorded deed is an act which affects the title to real estate. Such cancellation is the destruction of a muniment of title. It involves directly the title to real estate. The decree annulling the deed acts directly upon the land and the title thereto."

We agree to the holding in the Grimm case, that a Missouri court does not have jurisdiction to decree the cancellation of a deed to lands situate in another state, but we do not agree to defendants' contention that the holding in the Grimm case demonstrates our lack of jurisdiction in the case at bar. While the petition states a case for the cancellation of the royalty deed, its allegations would also warrant a decree directing defendant W. F. Duvall to retransfer the royalty to plaintiffs. The pertinent part of the prayer of the petition reads as follows:

"Wherefore plaintiffs pray the order and decree of this court . . . ordering and directing the retransfer to plaintiff or the cancellation and annullment of the . . . royalty deed. . . ."

A decree ordering defendant to retransfer the royalty to

plaintiff would operate directly upon the person but would not operate directly upon the title to the land. The rule is stated in 21 Corpus Juris, page 150, section 131 as follows:

"The general rule is that where a court of equity has jurisdiction over the person of defendant it may render any appropriate decree, acting directly upon the person, although the subject matter may be without the jurisdiction; and it may in such cases compel the performance of a contract or prevent the prosecution of an action outside the jurisdiction. Without regard to the jurisdiction of the subject matter, courts consider the equities between the parties and decree *in personam* according to those equities and enforce obedience to their decrees by process *in personam.*"

Section 132 of the same authority says:

"Courts of equity having jurisdiction of the parties may administer full relief without regard to the nature or situation of the property involved, and may compel the conveyance of property which lies beyond its jurisdiction, provided it can enforce its decree by the exercise of its powers over the persons before it."

A court of equity having jurisdiction of the person should and does have authority to command such person to do or not to do a particular thing according to the equities of the situation presented. This rule proceeds on the theory that the mandate of the court operates upon the person of the litigant who, as a resident within the jurisdiction of the court from which the mandate is issued, may be compelled to recognize and obey its laws and the decrees of its tribunals. [State ex rel. Railroad v. Nortoni, 331 Mo. 764, 55 S. W. (2d) 272, 273.] Our conclusion is that while the court below did not have jurisdiction to decree cancellation of the royalty deed, it did have jurisdiction to determine whether or not defendant, W. F. Duvall, should be required to reconvey the royalty to plaintiff. We do not construe the Grimm case, cited by defendants, as holding otherwise. If it does hold otherwise, it should not be followed.

■ At the time plaintiff, G. M. Hansen, acquired the eight hundred acres of Kansas land in 1921, it was encumbered by mortgages in excess of $40,000, placed thereon by the former owner, J. H. Elam. The notes secured by the Elam mortgages became due in 1924, at which time Hansen renewed them by giving new notes and mortgages. The renewed indebtedness totaled $47,600. Of this indebtedness, one note for the principal sum of $20,000, the other for $16,000 were secured by first mortgages on the land. The remainder of the indebtedness was secured by junior mortgages. The first mortgage notes bore six per cent interest until maturity, or until default, and ten per cent after maturity or default. The remaining mortgage notes, except two commission notes, bore seven per cent interest until maturity or default and ten per cent thereafter. Each of the

mortgages contained a provision assigning as additional security for the payment of the notes secured, all the rents, profits, royalties, rights and benefits accruing to Hansen under any oil or gas lease, and each of the mortgages contained a covenant against waste.

At the time this indebtedness was renewed there were no oil wells on the land and no leases outstanding. In July, 1926, plaintiff executed an oil lease on the entire eight hundred acres of land to one A. W. Christy, by the terms of which plaintiff was to receive royalty equal to one-eighth of all oil produced and saved from the leased premises. Drilling was started under the lease and oil was discovered in the latter part of October, 1926. Thereafter the owners of the notes secured by the mortgages on the land demanded that the one-eighth royalty from the oil produced be applied to the payment of the taxes and indebtedness against the land in accordance with the terms of their mortgages. Pursuant to this demand Hansen executed a written document called a "Division Order" which directed the company doing the drilling and producing the oil, to pay his one-eighth royalty to the Duvall Trust Company. This order was delivered by Hansen on December 22, 1926. The loans against the land had been made by defendant Duvall Trust Company, of which defendant W. F. Duvall was president. The trust company had sold the $20,000 and the $16,000 loan to investment bankers in Vermont. Some of the smaller notes secured by the junior mortgages were sold to clients of the trust company. The remainder of the small notes were still held by the trust company.

In December, 1926, when Hansen executed the "Division Order" there was only one well on the land. At that time taxes against the land and interest on the encumbrances were two years in default. Drilling was progressing slowly. Hansen found himself in need of money. The provisions of the mortgages gave the mortgagees all of the royalty to be applied on the indebtedness. Hansen wanted a part of the royalty released to him. He was also fearful that some of the holders of past due paper might institute foreclosure proceedings. Several conferences were had between Hansen and defendant W. F. Duvall and much correspondence passed between them looking to an adjustment of the indebtedness against the land whereby a part of the royalty might be released to Hansen and the past due indebtedness extended. These conferences and the correspondence finally brought about a written agreement between Hansen and W. F. Duvall providing, among other things, that Hansen would deed to W. F. Duvall one-fourth of his one-eighth royalty interest in consideration of which Duvall agreed to provide for the extension of the past due indebtedness represented by the junior mortgages, and arrange for the modification of the assignment of royalties so that fifty per cent of the royalty should be applied in payment of the

indebtedness against the land, payment to be made through the defendant, Duvall Trust Company; thirty-seven and one-half per cent of the royalty released to Hansen, twelve and one-half per cent to be deposited in a trust fund to be used to pay one-fourth of the balance of the indebtedness in event the fifty per cent was not sufficient to pay said indebtedness, but in event the fifty per cent was sufficient to pay such debts, then the twelve and one-half per cent would belong to defendant, W. F. Duvall: that after such indebtedness was paid out of the royalties as above provided, or by mutual agreement between the parties, the royalties thereafter accruing were to be divided between the parties viz.; seventy-five per cent thereof to Hansen and twenty-five per cent to W. F. Duvall.

W. F. Duvall performed his part of the agreement. He obtained authority from the holders of the mortgages to release to Hansen thirty-seven and one-half per cent of the royalty. In order to get such authority he was compelled to personally guarantee the payment of the $20,000 and the $16,000 notes to the Vermont banks who were the owners and holders of the notes. He also arranged for the extension or renewal of such of the notes as were past due. Hansen and his wife by deed conveyed to defendant, W. F. Duvall, one-fourth of the one-eighth royalty accruing to Hansen under the oil lease. This deed was recorded in the deed records of Miami County, Kansas. Thereafter on September 23, 1927, Hansen paid to the Duvall Trust Company as the representative of the owners of the mortgage indebtedness the full amount remaining due thereon, which, at that time amounted to $51,607.25.

Plaintiffs brought this suit asking that W. F. Duvall be required to convey to them the one-fourth of the one-eighth royalty which they conveyed to him, on the ground that he exacted and received the conveyance of such royalty in addition to the legal rate of interest for the use of money; and for that reason it constituted usury which they were entitled to recover. Plaintiffs also claim they paid usurious interest in the sum of $395.95, which they seek to recover.

Plaintiffs contend that the entire transaction was a loan by W. F. Duvall or by the Duvall Trust Company of which he was president, and a readjustment of the security; that it is immaterial whether Duvall acted for himself or for the trust company; that he was not agent for Hansen and performed no service for him.

We agree with plaintiff that it is immaterial whether W. F. Duvall represented himself or the Duvall Trust Company, but we do not agree that he performed no service for Hansen. At the time Hansen and Duvall entered into the written contract providing for a release of a part of the royalty to Hansen and the extension or renewal of past due paper, the major part of the loan was not owned by either W. F. Duvall or the Duvall Trust Company. By the terms of the

mortgages securing the loan all the royalties were assigned to the mortgagees as additional security for the payment of the loan. Hansen was in need of money and wanted a part of the royalty released to him. W. F. Duvall obtained authority from the mortgage holders to release thirty-seven and one-half per cent of the royalties to Hansen, but in order to get such authority he had to and did personally guarantee the payment of $36,000 of the loan owned by the Vermont bankers. Thirty-seven and one-half per cent of the royalty was thereafter paid to Hansen. The release of the royalty to Hansen and the obligation Duvall assumed in order to get such release was a valuable service rendered to Hansen in addition to the extension of the past due paper and the interest paid for the use of the money. It cannot be disputed that Duvall would be entitled to the agreed compensation for such services if he acted for himself individually. Under settled rules of law the trust company would have been entitled to the agreed compensation had it rendered the services to Hansen which Duvall rendered. The applicable rule is stated in 27 Ruling Case Law, page 231, section 32, as follows:

"The law seems to be well settled that where a contract for a loan provides for the rendition of services by the lender to the borrower, a fair charge for the services, in addition to the legal rate of interest on the money loaned, does not render the contract usurious. Accordingly where the lender is a commission merchant, he may charge a reasonable commission for accepting bills of a customer and providing funds for meeting them. This is a compensation for the service rendered in lending his credit and raising money to meet the debt of another. Moreover, where the lender has contracted to do certain things for the borrower in consideration of additional compensation, the contract is not rendered usurious by the circumstance that the borrower later voluntarily elects himself to perform those services. The lender, standing ready to perform his undertaking, is entitled to the compensation. But on accepted principles a charge or commission for alleged services cannot be made for the purpose solely of evading the usury laws, and therefore, to be sustained as lawful and to rescue the contract from the taint of usury, the additional charge must be shown to be based on some service rendered, some trouble encountered, or inconvenience sustained, or risk assumed by the lender, other than the advance of money."

A contract similar to the one in this case was construed by the Supreme Court of Michigan in Barras v. Youngs, 152 N. W. 219. In that case the plaintiff was the owner of an undivided quarter interest in certain real estate, a part of which was known as "Weimer's Field." The plaintiff's undivided interest was encumbered by a mortgage held by one of his cotenants, John R. Ross. This mortgage was foreclosed and plaintiff's interest sold to his cotenant Ross on De-

cember 14, 1907. The amount required to redeem approximately $1500, and the time of redemption expired on June 14, 1908. Negotiations were had between plaintiff and defendant which resulted in defendant's furnishing plaintiff the money with which to redeem the property. During the negotiations, plaintiff made defendant the following proposition:

". . . Therefore, if you are willing to take your security on the Weimer and the pay from the sale of lots, I to give you a deed of trust for same, and when the money you have advanced and the interest thereon is paid up from the sale of lots, I will then give you a deed for one-half of my interest then remaining in the whole Weimer eighty; that is an undivided one-eighth interest. This said agreement can be embodied in the trust deed. . . . If the proposition meets with your approval, have trust deed made out and my wife and I will sign same. . . ."

The offer was not accepted in the exact terms proposed but a deed of trust was executed by plaintiff and his wife providing for the repayment of the money advanced by defendant to redeem· the property from the mortgage sale together with interest at the rate of six per cent per annum. The deed of trust also provided that defendant should render certain designated services in connection with the redemption and sale of the property.

Contention was made in the case that the agreement to convey a one-eighth interest in the land in addition to the rate of interest provided for in the deed rendered the deed a usurious contract.

In rejecting that contention the Supreme Court of Michigan said:

"That the consideration for the transfer of one-eighth of the land was the loan is not accepted. On the contrary the conclusion from all the evidence is that the consideration for such transfer was services to be rendered by the defendant. The trust deed contemplated various services to be performed by the defendant. He was required, not only to furnish money for redemption, but to actually effect redemption by paying over to the proper person or depositing with the proper office the redemption money. He not only was expected to furnish money for the payment of taxes, but he was to pay the taxes, and to that end pay the money to the proper treasurer and procure a proper receipt. If occasion arose he was to negotiate and execute options for mining leases of any or all the lands covered by the trust deed. He was to arrange with the other owners for their consent to the making and recording of the proper and lawful plat, and bring them in accord with himself in relation to prices, terms of sale, and in all other matters pertaining to any and all the lands covered by the trust deed, which both parties had reason to anticipate would be, and, as appears, was, no light task, owing to the bad blood between the complainant, his mother and Mr. Ross. Finally he was to sell

and dispose of the lots 'in such manner and for such terms as he might from time to time deem proper and profitable.' "

The contract in the case above cited was held not to be usurious for the reason that the interest in the land which the defendant was to receive in addition to the legal rate of interest on the money loaned, was for *bona fide* service to be rendered by defendant. The same thing may be said in the case at bar. The undivided one-fourth of the one-eighth royalty interest which Duvall was to receive in addition to the legal rate of interest on the loans was for valuable services which Duvall agreed to and did render to Hansen.

Further contention is made that the compensation claimed by Duvall is grossly in excess of any possible service, and, therefore, a mere cover for usury.

■ It is settled law that to constitute usury there must exist an intent to charge more than the legal rate of interest for the use of money, and the burden is always on the party asserting usury to so show. [Tobin v. Neuman, 271 S. W. 842, 844; 27 R. C. L. 223.] Where, as in this case, the contract does not import usury on its face, the facts and circumstances in the case must show that the lender had a purpose in his mind to get more than the legal rate of interest for the use of money. So the determinative question is what intention and purpose Duvall had in making the contract with Hansen.

The record shows that the surface of the land was not worth the encumbrance. The income from the land was not sufficient to pay taxes and interest on the loan. At the time Duvall and Hansen entered into their contract the interest on the loan and the taxes were in default. There were only three wells on the land, and the value of the oil field was problematical.

E. A. Smith, an oil man of six or eight years experience, testifying for plaintiff, gave it as his opinion that on January 17, 1927, the date of the Duvall and Hansen contract, the one-eighth royalty on the Hansen land, with three producing wells, was worth from forty to sixty thousand dollars. On cross-examination this witness said that oil was pretty much of a gamble; that you cannot tell the size of the pool of oil, and when you undertake to say what a lease is worth it is to some extent a gamble.

G. E. Phillips, one of the owners of the lease on the Hansen land, testifying for plaintiff gave it as his opinion that in January, 1927, the value of the one-eighth royalty interest was anywhere from thirty, forty, fifty or sixty thousand dollars; that there was not any particular value; that he did not know what the value would be; that it looked like a big field there at that time, as to royalty interests. On cross-examination he testified that it was pretty hard to tell what they had; that no one could tell whether the pool of oil was large or small;

that there was no question but what it was a pure gamble as to what oil was on the Hansen land; that offsetting the Hansen land there were lots of dry holes drilled, and it was pretty sure that oil would not be discovered on all of the Hansen land.

It appears from the testimony of plaintiffs' witnesses that their estimate of the value of Hansen's one-eighth royalty interest was to a large extent based on guess and speculation. If the oil field did not prove productive, Hansen stood to lose some money on his guarantee. No unbiased mind can read the record in this case without being forced to conclude that Duvall's intention was not to get an unlawful rate of interest for the use of money. The only legitimate inference to be drawn from the evidence is that he was willing to take a gambler's chance by guaranteeing $36,000 of Hansen's indebtedness and obtaining a renewal of his past-due paper, in the hope that the oil field would prove productive and thus enable him to make some real money. It is true that from the time oil was discovered in October, 1926, up to the time of the trial in June, 1928, Duvall's one-fourth of the one-eighth royalty amounted to something over $9,000, but as an intention on Duvall's part to charge usurious interest is the essence of plaintiffs' case, the situation must be reviewed in the light of the circumstance existing at the time the contract was made. At that time neither Duvall nor Hansen knew what the oil field would prove to be. Hansen was badly in need of money. He wanted a part of the royalty released to him and his past-due indebtedness renewed, and was willing to give one-fourth of his one-eighth royalty for that service. •Duvall was willing to assume the task and guaranteed the payment of $36,000 of Hansen's obligations in order to get it done. The circumstances lead us to hold that the contract was an honest one, for actual service to be rendered by Duvall and not a mere cover for usury.

Plaintiffs make the further contention that the mortgages did not convey to the mortgagees any rights to or interest in royalty under an oil lease not in existence at the time the mortgages were executed, and as the mortgagees had no interest in or lien on such royalty, Duvall's personal guarantee of the payment of the $36,000 loan in order to obtain from the mortgagees a release of a part of the royalty to Hansen was of no legal force or effect. Contention is also made that the royalty was personal property and the rights of the parties thereto must be determined by the "Division Order" which plaintiffs executed after the mortgages were given and after oil was discovered under the lease in question.

We need not determine whether royalty under an oil lease is real or personal property. If the royalty was a part of the realty it passed to the mortgagees by the terms of the mortgage which conveyed the realty as security for the loans. On the other hand, if

the royalty was personal property, it passed to the mortgagees by the assignment provision in the mortgage which assigned all royalties to the mortgagees as additional security for the payment of the loan.

Plaintiffs' contention that the assignment provision in the mortgages did not create a lien against the royalty because the royalty was not in existence at the time the assignments were made, cannot be upheld. It is settled law that where parties, by their contract, intend to create a lien upon either real or personal property, whether *in esse* or not, it attaches, in equity, as a lien upon the particular property, as soon as the assignor acquires title thereto. [Rutherford v. Stewart, 79 Mo. 216, 217; France v. Thomas, 86 Mo. 80; Keating v. Hannenkamp, 100 Mo. 161, 13 S. W. 89.] Evidently both parties intended that the mortgages should create a lien on the royalty in favor of the mortgagees, because after oil was discovered and production was started, the mortgagees demanded that the royalty due Hansen under the lease be paid to them, and Hansen not only testified that the royalty was pledged to the mortgagees, but joined in the execution of a written instrument called a "Division Order" which directed the lessee to pay the royalty to the mortgagees.

We recognize the rule that lenders of money may not charge a commission or bonus for *alleged services* for the purpose of evading the usury laws, but a charge for *services actually rendered* to the borrower, in addition to the legal rate of interest would not render the loan contract usurious. The record shows that W. F. Duvall acting for himself or for the trust company obtained authority from the mortgagees to release thirty-seven and one-half per cent of the royalty to Hansen. He personally guaranteed the payment of $36,000 of Hansen's indebtedness in order to obtain such authority. The deed to one-fourth of the one-eighth royalty which he received was compensation for his service in lending his credit and obtaining a release of the royalty to Hansen and for that reason was not usury. [27 R. C. L. 231; Houghton, Receiver, v. Burden, 228 U. S. 161.].

Further contention is made that at the time Hansen paid the entire mortgage indebtedness in September, 1927, he paid the full amount of interest permitted under the laws of Missouri and in addition thereto excess usurious interest in the sum of $395.95.

The Duvall Trust Company made the original loan to J. H. Elam, the former owner of the land, who at that time resided at Wichita, Kansas, and the proceeds of the loan were paid to him there. When this loan became due in 1924, Hansen executed new notes and mortgages covering the amount of principal and interest due on the original loan. Both Hansen and the payee in the notes resided in Missouri. The notes were executed in Missouri and made payable there. These notes drew ten per cent interest after maturity or after default. Hansen contends that the notes given by him were

Missouri contracts, and the exaction of ten per cent interest after maturity constituted usury under the laws of this State, by reason of which· he was compelled to pay $395.95 in excess of lawful interest.

The acceptance of the notes of Hansen in lieu of the notes of Elam, the former owner of the land, would not amount to a payment of the Elam notes unless the parties agreed that it should so operate. [State Bank v. Hafferkamp, 315 Mo. 465, 476, 287 S. W. 331, 335; Leabo v. Goode, 67 Mo. 126; Appleton v. Kennon, 19 Mo. 637.] No such agreement was shown, and for that reason the Hansen notes must be regarded as a renewal and not as a payment of the original loan. If the original loan was a Kansas contract, .the renewal notes, although executed in Missouri and made payable there, would be governed by the laws of Kansas. The rule governing such renewals is stated in 39 Cyc. 930, as follows:

"The renewal of a note or other obligation for payment of money in a place different from that in which the original was made does not change the *situs* of the contract. The law applicable to the original obligation governs the renewal also."

The renewal notes exacted ten per cent interest after maturity or after default. Such exaction would be usury under the laws of Missouri, but would not be usury under the laws of Kansas. If the original loan was a Kansas contract, its renewal, although executed in Missouri, would be governed by the law of Kansas and would not be usurious. On the other hand, if the original loan was a Missouri contract, the renewal would be governed by the law of Missouri and would be usurious. So the question of usury turns upon whether the original loan was a Missouri or a Kansas contract. The burden being on plaintiffs to show usury, the burden was on them to show that the original loan was a Missouri contract. No such showing was made, and for that reason we hold that plaintiffs failed to show that the exaction of ten per cent interest in the renewal notes was usury.

The written agreement entered into between W. F. Duvall and Hansen in January, 1928, providing that thirty-seven and one-half per cent of the royalty should be released to Hansen, also provided for the extension or renewal of such of the indebtedness as was past due. Something over $18,000 of the indebtedness was past due at that time. One note for $3,000 was extended by an extension agreement. The notes representing the remaining $15,000 were renewed by Hansen's executing new notes. These notes were executed in Missouri and drew ten per cent interest after maturity.

During the negotiations which culminated in the execution of the written contract providing for the release of a part of the royalty to Hansen and the renewal of the past-due indebtedness, Duvall sent Mr. McVey, Hansen's attorney, a draft of the contract and the

renewal notes for execution by Hansen. McVey replied by letter calling attention to some minor changes in the contract which he thought should be made. Of the rate of interest called for in the notes, he said:

"We feel also that the charge of ten per cent interest, in view of the adjustment of all these past due items, is hardly appropriate, and that no more than eight per cent should be charged under any circumstances. . . . The provision of the notes calling for ten per cent interest after maturity seems to us to be excessive, and we request that you draw new notes, making the ordinary provision of eight per cent after maturity."

Mr. Duvall immediately replied to that letter, in which reply, he said:

"That new mortgage which we have drawn is just as all of the Kansas mortgages are, and they draw 10% after due, and I cannot change that. It is a penalty in Kansas which they pay by having 18 months redemption law and that clause is put in there not because they care for the 10%, but it is to try to urge them to make their payments and I see nothing wrong about that. I believe you get it confused with Missouri. Missouri papers all draw 8% after due, and in Kansas, all notes that I have ever seen draw 10% after due according to their law."

Duvall also replied to a telegram from Hansen, as follows:

"We have today mailed corrected contract following Mr. McVey's corrections exactly. Have also extended the payments at request, for three years. Change of interest after maturity to 8% we cannot do. The law calls for 10% after due."

█ It clearly appears from Duvall's letters that he thought the 1927 renewal notes were Kansas contracts, and intended that the notes, if executed by Hansen, would be governed by the laws of Kansas. Without doubt Hansen knew that Duvall was proposing Kansas contracts. With that knowledge his acceptance of Duvall's proposal by executing the renewal notes which called for ten per cent interest after maturity amounted to an agreement between the parties that the notes were Kansas contracts and would be governed by the law of that forum. Parties to a loan contract have a lawful right to agree that the contract shall be governed by the law of a particular state, where, as in this case, some element of the contract is properly referable to that state. [39 Cyc. 897; Brotherhood Railroad Trainmen v. Adams, 5 S. W. (2d) 96; Fidelity Loan Securities Co. v. Moore, 280 Mo. 315, 217 S. W. 288; 5 R. C. L. 978; Royal Loan Assn. v. Forter, 68 Kan. 478, 75 Pac. 484; 39 Cyc. 905; Seeman v. Philadelphia Warehouse Co., 274 U. S. 403, 47 Sup. Ct. 627.]

█ Further contention is made that the court erred in appointing a referee before the pleadings were made up. The claim is that

at the time the referee was appointed, there was pending and undetermined two motions—one to strike out portions of defendants' answer—the other to make the answer more definite and certain. At the time the circuit court referred the case, plaintiffs did not object to the reference on the ground that the pleadings were not made up. That objection cannot be made for the first time here. This objection was made to the referee at the beginning of the taking of testimony before him, but the referee had no authority to determine the question. Such an objection, to be effective, should have been made to the court itself at the time the case was referred. [State ex rel. v. People's Ice Co., 246 Mo. 168, 198, 151 S. W. 101.] Plaintiffs did object in the court below to the appointment of a referee on the ground that the case was not a proper one for compulsory reference, but they make no complaint on that score in the briefs filed in this court. In this situation, the point must be treated as abandoned.

We agree to the conclusion of the referee that there was no usury shown in any of the transactions, but we do not agree with all of his reasons for reaching that conclusion. This being an equity case we are not bound by the conclusions or findings of the referee, but are at liberty to make our own findings. Our conclusion is that plaintiff failed to prove usury and for that reason the judgment should be affirmed. It is so ordered. All concur.