249 S.W.2d 381 (1952)
HOWELL et ux.
v.
REYNOLDS et al.
No. 42466.
Supreme Court of Missouri, Division No. 1.
June 9, 1952.
*383 Flynn and Parker, Francis C. Flynn, Norman C. Parker, St. Louis, for appellant.
Carroll J. Donohue, Salkey & Jones, St. Louis, for respondents.
HOLLINGSWORTH, Judge.
Plaintiffs-respondents brought this action in the Circuit Court of the City of St. Louis in three counts against defendant-appellant and the remaining defendants as co-partners, allegedly doing business under the firm name of Afro-American Building Improvement. By their first count they sought to recover damages from defendants in the sum of $10,000 for breach of a contract entered into between plaintiffs and defendants whereby defendants, for a consideration of $5,950, agreed to build a four room residence on a lot owned by plaintiffs in the City of Jennings, St. Louis County, Missouri, and for the breach of a supplemental contract increasing the consideration to $7,250. In their second count plaintiffs alleged fraud in the procurement from them by defendants of a note for $5,950 and deed of trust on said property securing the same, and sought $10,000 actual and $10,000 punitive damages therefor. In the third count plaintiffs, realleging fraud in the procurement thereof, sought cancellation of said deed of trust.
All defendants, other than A. W. Reynolds, defaulted. He answered, denying the partnership and alleging that he alone did business under the name of Afro-American Building Company. He (1) admitted the contracts, denied the breach thereof, alleged their performance by him and their breach by plaintiffs, and sought damages therefor in the sum of $9,000; (2) denied fraud in the procurement of the note and deed of trust, alleged fraud on the part of plaintiffs, and sought $10,000 actual and $10,000 punitive damages therefor; and (3) sought recovery for an alleged balance due for labor and materials furnished in the sum of $3,653.89.
The trial court found for defendants on plaintiffs' two counts for damages, for plaintiffs on their plea for cancellation of the note and deed of trust, for plaintiffs on defendants' two counts for damages, for defendants in the sum of $750 on the count for labor and materials, and entered a decree in accordance therewith.
Defendant A. W. Reynolds has appealed and in his appeal complains only of (1) that portion of the decree cancelling the deed of trust, and (2) the insufficiency of the award of $750 on the count for labor and materials.
That portion of the decree cancelling the deed of trust on the ground of fraud involves title to real estate within the meaning of Article V, § 3, Constitution of Missouri, V.A.M.S., investing this court with jurisdiction of appeals in such cases. Conrey v. Pratt, 248 Mo. 576, 154 S.W. 749; Nettleton Bank v. McGauhey's Estate, 318 Mo. 948, 2 S.W.2d 771, 775; Munday v. Austin, 358 Mo. 959, 218 S.W.2d 624.
At this point serious jurisdictional questions are presentedquestions raised by neither of the partiesbut which this court of its own motion must determine: Did the Circuit Court of the City of St. Louis have jurisdiction to cancel for fraud in its procurement a deed of trust on land in St. Louis County? And, if it did not, then does this court have jurisdiction of the appeal? Section 508.030 RSMo 1949, V.A.M.S., provides: "Suits for the possession of real estate, or whereby the title thereto may be affected * * * shall be brought in the county where such real estate, or some part thereof is situated." The statute is mandatory as to venue in bringing such an action, and this court has consistently held it so to be, and its provisions cannot be waived. Castleman v. Castleman, 184 Mo. 432, 83 S.W. 757; State ex rel. Gavin v. Muench, 225 Mo. 210, 124 S.W. 1124; Alluvial Realty Co. v. Himmelberger-Harrison Lumber Co., 287 Mo. 299, 229 S.W. 757, *384 762; Marston v. Catterlin, 290 Mo. 185, 234 S.W. 816; State ex rel. Minihan v. Aronson, 350 Mo. 309, 165 S.W.2d 404, 408. We hold that the trial court was without jurisdiction to decree cancellation of the deed of trust.
We deem it necessary to state, however, that we do not hold that after an action, either transitory or local, is properly instituted in any county that the court may not thereafter acquire jurisdiction of title to real estate situate in another county if it becomes necessary under the issues thereafter arising so to do in order to determine and adjudicate the rights of all parties to the suit. Section 509.060 of the Civil Code clearly indicates that once jurisdiction of a controversy and the parties thereto has attached the court has jurisdiction to determine all properly pleaded phases thereof. See also Rice v. Griffith, 349 Mo. 373, 161 S.W.2d 220, and Robinson v. Field, 342 Mo. 778, 117 S.W.2d 308. Section 508.030, although mandatory as to the place of bringing an action affecting title to real estate, is, nevertheless, solely a venue statute. Henderson v. Shell Oil Co., 8 Cir., 173 F.2d 840. It does not restrict the trial and adjudication of defensive issues involving title to real estate to the county in which the real estate is situated. Neither does it restrict the general jurisdiction invested in circuit courts under the provisions of Article V, § 14, of the Constitution. Rice v. Griffith, supra. We do not agree with the portion of that opinion basing the decision therein rendered on the ground that plaintiff therein "waived" venue of the issue involving title to real estate presented by defendant's answer; rather, do we think that jurisdiction of that issue was properly vested for the reasons above stated.
The decree expressly determined an issue affecting title to real estate. Therefore, even though the judgment of the trial court was void, nevertheless jurisdiction of the appeal lies in this court. In the case of Watts v. Watts, 304 Mo. 361, 365, 263 S.W. 421, 422, an analogous situation was under consideration, and this court there said: "It is claimed that, because the judgment attempting to divest the title to the real estate is void, this court is without jurisdiction of the appeal. The title to real estate is directly affected by the judgment so as to give this court jurisdiction, although the judgment is void on its face. This is the court to determine the question whether the judgment, which in form transfers property from one party to another, has that effect." See also Kennedy v. Duncan, 224 Mo. 661, 666, 123 S.W. 856, and State ex rel. Brown v. Hughes, 345 Mo. 958, 137 S.W.2d 544. And, once jurisdiction has been invested on one issue, it is retained for determination of all of the issues. 15 C.J., Courts, § 139, p. 825; 21 C.J.S., Courts, § 94, page 147. See also Barnes v. Metropolitan St. Ry. Co., 119 Mo.App. 303, 305, 95 S.W. 971; Mann v. Bank of Greenfield, 323 Mo. 1000, 20 S.W.2d 502, 506.
It does not follow that because the trial court was without jurisdiction to cancel the deed of trust that the portion of the decree cancelling the note is void. It was invested with jurisdiction so to do if the petition sought cancellation and the evidence warranted it. Hansen v. Duvall, 333 Mo. 59, 62 S.W.2d 732, 734. And, inasmuch as the third count of the petition sought general relief, the trial court had jurisdiction to restrain appellant from enforcing payment of the note, if the evidence so warranted. Kleber v. Carlos, Mo., 202 S.W.2d 865.
The petition, although alleging fraud in the procurement of both the note and deed of trust, asks only for cancellation of the deed of trust. This is clearly an oversight. The record shows that both parties tried the case on the theory that cancellation of both was sought. The decree expressly cancels both; and appellant does not question it on that ground. Hence, the petition will be considered as amended to include a prayer for cancellation of the note. Section 509.500, RSMo 1949, V.A.M.S. Allaben v. Shelbourne, 357 Mo. 1205, 212 S.W.2d 719, 725. We must therefore review the case on the errors assigned as to cancellation and the insufficiency of the award on appellant's counterclaim.
*385 Plaintiffs, husband and wife, were married after each left military service following World War II. They had acquired the lot in 1946, and in the spring of 1948 were endeavoring to finance and build a home thereon. Efforts to obtain a loan had been unavailing. In response to a newspaper advertisement of the Afro-American Building Improvement, plaintiffs went to the office of that concern, where they met appellant. Several meetings ensued.
Plaintiffs' evidence was:
They told appellant they had no money, had been unable to obtain a construction loan, and that there was no point in taking his time unless he could obtain a loan for them. Appellant then told them that "his company" or "his backers" would finance the building of the house and upon its completion they could get a FHA or other loan and pay off "his company". After some discussion, appellant agreed to furnish blue prints of plans for a home to cost $5,950, and a contract, prepared by appellant, was entered into. Plaintiffs were required to pay, and there paid appellant, $85 to cover the cost of blue prints.
This contract, dated April 12, 1948, has the following legend printed at the top thereof:
 "T. W. MerchantTreasurer
 "J. A. McWillieGeneral Manager

The Afro-American Building Improvement"
It provides that "This four room Bungalow will be constructed according to certain Blue Print Plans with the specifications thereto, governing the construction of the same"; that upon production of a contractor's bond as security to perform the obligations of the contract to build "the said house now helt in-mind", one-third of the contract price shall be paid; that "when the excavation has been done,
 S. P. ReynoldsArchitect and Construction Supervisor
 J. H. PerkinsSecretary
concrete footings put in, foundation walls constructed, and waterproofed from the out side, the steel girderwith its steel posts installed, with floor joist and sheet flooring nailed down; then upon the production, of all `Lien Wavers' showing that all labor and material has been paid for up to date, then a second third will be paid * * *"; and for payment of the remaining third upon completion of the work. Specifications are attached thereto. It is signed in this manner:
 "John H. Perkins Mrs Ruth Howell
 ____________________ _________________
 Sylvester P. Reynolds John C. Howell
 _______________________ __________________
 Afro-American Building Imp. Owners
 Afro-American Building Imp.
 By A. W. Reynolds"
 ________________________
The contract at no place fixes the price for which the house was to be built. But, it is agreed, it was to be $5,950.
Sometime after the contract was signed, appellant learned that plaintiffs had $900. Within a week thereafter, appellant called plaintiffs asking them to raise $900, stating that "the backers of his company would advance the building of the house" if plaintiffs would put up $900 to show their good faith, and that that amount would be deducted from the building cost when the building was completed. Plaintiffs complied with appellant's suggestion and paid that sum over to him on June 11, 1948, for which they received his receipt reciting: "Previous balance $5,950, amount paid $900, balance due $4,965."
Work began on the 13th or 15th day of June. Then followed a series of mishaps. After the footings were installed, it was discovered they were below the sewer line and the foundation had to be raised. Steel reinforcement was left out *386 of the footings, as called for in the specifications. Appellant at first denied the specifications called for it, but finally conceded that "they would have to go out there and pour more concrete and put the steel in it." On three occasions during the construction of the foundation walls, they were found to be out of plumb and had to be torn down and rebuilt. The subfloor caved in.
Work stopped about the middle of July for the reason, as explained by appellant to plaintiffs, "his backers" would not put up the money to finance the house unless he paid them a five per cent commission, which he said he refused to do. Plaintiffs continued to wait until, finally, appellant told them he had a man that would get the loan for them. The loan was eventually refused.
Thereafter, appellant, accompanied by a man named Rhineberger, came to the residence of plaintiffs and asked them to sign a deed of trust for $5,950, payable $37.50 each month for twenty years. Appellant stated to plaintiffs that "his backers" wanted something to show for the money they were going to put in the house and that as soon as the note and deed of trust were signed he would complete the house and plaintiffs would be in it by Thanksgiving of that year. They signed the deed of trust, but did not acknowledge it before any notary public or other person.
Very little, if any, work was done after the note and deed of trust were signed. Plaintiffs demanded the return of the deed of trust. Appellant told them Ben Weinstein had it, but plaintiffs were never able to locate him.
In December, 1948, plaintiffs wanted a slight change made in the plans that amounted to about $300, and a supplemental contract was written increasing the price of the house from $5,950 to $7,250. The increase over and above the $300 was exacted by appellant because of the mistake in placing the foundation below the sewer level.
Still the work, which had been stopped in July, was not resumed. It was not until 1949 that appellant started to resume work, at which time plaintiffs stopped him from doing so. Plaintiffs paid a third person a bill for excavating the basement in the sum of $150. Appellant never demanded payment of one-third of the contract price, having asked only for the $900 to show "good faith".
The records of St. Louis County show that the deed of trust, bearing a purported acknowledgment attested by Harrison W. Hollie, a notary public, was filed for record in the recorder's office on June 23, 1949.
Forrest Criswell, an experienced building contractor, testified that he had examined the partially built property; that it consisted of a 24x28 feet concrete block foundation, stuccoed inside and out, with concrete slabbing on the back porch, and a subfloor, and that there were concrete blocks on the lot that could be used on the upper part of the building. He estimated the cost of the amount of construction he found there, including labor and materials, as of the summer of 1948, at not to exceed $1,200.
Appellant's evidence was:
He admitted that "Afro-American Building Improvement" was a registered fictitions name showing the names of himself and his co-defendants as partners or associates, and that, in fact, he alone operated under that name and his co-defendants had no interest therein. He had registered under that name because of "a tragedy that happened to [him] that [he] had no control over".
The blueprints and plans were completed and accepted nine days after the original contract of April 12th was signed. The contractor's bond, signed by personal sureties, was executed and delivered about June 8th. About that time plaintiffs told him they had most of the money and "they figured" that if he started building a loan could be obtained from a loan company in Jennings, and asked him to accept $900 and start the building. He never agreed to finance the building. He asked plaintiffs if they could make payment of the one-third of the contract price, and "they were pretty sure they could". The delay from *387 April 12th to June 11th was occasioned in waiting for them to comply with the terms of the contract.
Work was started on June 21st. Extra work amounting to $1,300 was done in constructing the foundation. That was the reason for increasing the original contract price from $5,950 to $7,250. The cause for the extra work was that plaintiffs told him the sewer was sixteen or eighteen feet deep, and he made no investigation of the depth before the plans were prepared. But, when he measured it, after installing the foundations, he found it was less than twelve feet, which forced him to raise the foundation four or five feet. At that time he estimated the extra cost at $1,300. Plaintiffs asked him if he was willing to "carry them and let them pay it in monthly installments", to which he agreed. He borrowed money on his home to do so.
When the cost of the extra work was discussed, plaintiffs did not have the money and had not obtained a real estate loan. They "figured" he could get it. He then asked about the money he had "put in there". They said they would secure him any way he asked, to prove they would pay him. That was the reason of the deed of trust. At that time the building was about three-sevenths completed.
An application for a loan was made to FHA. It was made through a Mr. Milligan, whom appellant, at the request of plaintiffs, sent to plaintiffs. FHA would not approve the plans and changes were made. FHA eventually refused to make the loan. Appellant sought loans from other companies, but only because plaintiffs asked him to do so.
Appellant spoke to plaintiffs about money, but they either could not pay or were "trying to do so". The deed of trust was signed at the office of Harrison Hollie. It was to be held as a "guarantee". It was not intended as a deed of trust but was only intended to secure him for what he had put in the job above what plaintiffs had paid him. Appellant was not supposed to record it, and only did so after receiving a threatening letter from plaintiffs' counsel. No money was paid plaintiffs when the note was made and plaintiffs have paid nothing on the note.
The last work was done on the building in November, 1948. The stoppage was caused by plaintiffs' failure to furnish the finances to pay for labor and materials. Plaintiffs never at any time stopped him from resuming work.
The cost of the building to date is $4,632.89, less the payments made by plaintiffs in the sum of $985, leaving a balance of $3,653.89. Appellant's efforts to explain the above figure of $3,653.89, if not wholly unintelligible, are jumbled and unsatisfactory, to say the least of them.
Appellant viewed the property during the trial and some changes had been made. Three courses of blocks had been taken off and part of the foundation walls had been covered with dirt. (Plaintiffs denied this statement, asserting it was in the same condition as it was originally.)
Harrison Hollie, a lawyer, testified that he prepared the note and deed of trust and took plaintiffs' acknowledgment at his office. He admitted he made no record of it in a book he kept for that purpose, and that he had theretofore certified to acknowledgments without having the instrument signers in his presence. He said, however, he frequently failed to enter properly taken acknowledgments in his record book.
The trial court made no finding of facts. The count seeking cancellation of the note and deed of trust being an action in equity, the evidence relating thereto will be reviewed de novo, with due deference given to the conclusions of the chancellor. Bohnsack v. Hanebrink, Mo.Sup., 240 S.W.2d 903, 907. The evidence relating to the counterclaim, tried without a jury, will also be reviewed as a suit of an equitable nature. Section 510.310, RSMo 1949, V.A.M.S.; Cosentino v. Heffelfinger, 360 Mo. 535, 229 S.W.2d 546, 549.
The testimony of none of the parties is remarkable for its clarity. But, fairly summarized, plaintiffs' evidence tended to show: (1) appellant told them his "company" would finance the building of *388 the house and upon its completion they could get a loan and pay off "his company"; (2) he represented to them that "the backers of his company would advance the building of the house" if plaintiffs would put up $900 to show their good faith, and that it would be deducted from the cost when the building was completed, which amount they thereupon delivered to him; (3) thereafter, appellant told them "his backers" would not finance the house unless he paid them a commission, which he said he refused to do; (4) thereafter, he procured the note and deed of trust for $5,950 because, as he stated, "his backers" wanted something to show for the money they had put into the venture and that if they would sign, then the building would be completed for their occupancy by Thanksgiving; (5) after procuring the note and deed of trust he abandoned the project; (6) a false certificate of acknowledgment was affixed to the deed of trust and it was recorded, despite appellant's admission it was not to be considered a deed of trust and was not to be recorded.
This evidence, if believed, and it is apparent the court did believe it, when considered in connection with the admissions made by appellant, almost conclusively establishes that each of the above representations was false, was known by appellant to be false, was made for the fraudulent purpose of obtaining money and the note and deed of trust without any reasonable expectation on the part of appellant at any stage of the proceedings that he could comply with his promise to finance the building or complete its construction; that the note and deed of trust were not, in fact, sought or procured for the purpose of enabling him to complete the job; and that they were executed and delivered in reliance upon appellant's promise to do so.
Appellant had no "company", no "backers", no assets. He secretly was a lone adventurer, doing business under the false claim of being a member of a responsible concern, and speculating upon the credulity of plaintiffs. "Afro-American Building Improvement", with its purported personnel, was sheer "window dressing". He took a note and deed of trust for the full amount of the original contract ($5,950); and at the same time he admits that at most they were intended to secure the money theretofore advanced by him over and above the $900 paid him by plaintiffs, which he also admitted to amount to no more than $3,653.89; and he was unable to explain either amount. Surely, he knew that when he recorded the deed of trust plaintiffs could not possibly thereafter obtain finances to complete the building. Clearly, the evidence warranted cancellation of both the note and deed of trust obtained in the manner and by the means aforesaid. Mentzer v. Mentzer, 325 Mo. 941, 30 S.W.2d 146; Frey v. Onstott, 357 Mo. 721, 210 S.W.2d 87.
The only justifiable criticism that can be made of the amount ($750) awarded appellant on his counterclaim for labor and materials is that it is excessive. The evidence, as the trial court must have viewed it, was that the total cost of materials and labor reasonably required in building the house to the stage of completion shown by the evidence when work was stopped would not be more than $750 above the amount theretofore paid appellant ($900, plus $150 paid to a third person on account of work in excavating for the foundation). Forrest Criswell testified the reasonable cost of all of construction work done would not exceed $1,200. It is possible that due to appellant's bungling the actual cost thereof did exceed that estimate to some extent. But plaintiffs are not to be required to pay more than the reasonable cost. Appellant either could not or would not testify to the items of cost for labor and materials which he said amounted to a total of $4,632.89, which amount, on its face, is incredible. It follows that the only credible evidence as to the reasonable value of the labor and materials was that of Criswell. That evidence did not justify as much as the court awarded. Hence, the appellant cannot complain.
In accordance with the provisions of paragraph 3 of section 512.160, RSMo 1949, V.A.M.S., the decree is ordered modified by deleting therefrom the order cancelling the deed of trust, and amended by ordering *389 that appellant and his co-defendants and each of them be perpetually restrained from attempting to collect or enforce payment of said note or any part thereof, and from assigning or transferring said note, and that said note be delivered to the clerk of the trial court for cancellation and surrender to plaintiffs. Said decree, when and as so modified and amended, is affirmed.
All concur.